Larry **FLETCHER** and Anita Fletcher, Respondents,

v.

**CITY OF INDEPENDENCE,** Missouri, Appellant.

No. WD 35947.

Missouri Court of Appeals, Western District.

Jan. 28, 1986.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied March 27, 1986.

Application to Transfer Denied May 13, 1986.

George E. Kapke, Joe F. Willerth, Independence, for appellant.

James C. Wirken, Sue A. Sperry, Kansas City, for respondent.

Before PRITCHARD, P.J., and SHANGLER and DIXON, JJ.

SHANGLER, Judge.

The plaintiffs Fletcher, husband and wife, sued the City of Independence for injury to their persons and damage to their property from recurrent sewer backups into the basement of their home. The claims were submitted on the theory of nuisance, and the plaintiffs recovered. The jury returned a total of $39,000 in awards: $15,000 to husband Fletcher for personal injury, $6,000 to wife Fletcher for personal injury, and $18,000 to both Fletchers for property damage. The City of Independence contends on appeal, among other grounds, that under the evidence the issue was submissible—if at all—as a negligent nuisance and not as a *per se* or intentional nuisance, and hence the jury was required to compare the relative faults of the parties for verdict under the *Gustafson v. Benda* principle. We determine that the contentions of error are without ground, and affirm the judgment.

In May of 1971, the plaintiffs Fletcher purchased a home at 823 South Savage in the City of Independence and continued to live there until December of 1983. The purchase price was $14,000. The structure had been removed from another location in the city sometime earlier and placed on a new basement at the South Savage site. The home is located in a declivity at the southeast corner of the intersection of Savage and Sea, and faces west onto Savage. [Savage runs north and south, and Sea runs east and west.] The terrain slopes uphill from the home structure in three directions: Savage to the north, Savage to the south, and Sea to the east. In the middle of the intersection of those streets is located manhole 40 of the municipal sanitary sewer system. In the southeast of the intersection is an open catch basin—a component of the underground storm sewer system—which emerges from place to place to capture and carry off rain water. Thus, the Fletcher residence rests in the bottom of a watershed.

The Fletchers were not aware of any sewer backup concerns in the neighborhood at the time they came to own the premises in 1971. In early 1972, the Fletchers experienced the first sewer backup episode. It was raining, Fletcher heard the sound of gurgling water and discovered the basement covered with water to a depth of two to three feet. It gave off the stench of an open sewer—of offal and human waste. When the sewage receded, it left behind a film of slime and a residue of feces, worms and toilet paper. The sewage induced in Fletcher the urge to vomit. He shoveled and swept and scooped up the solids, removed them, and sprayed the basement. He then telephoned the City of Independence offices and was directed to the municipal Health Department, by that office to the Sewer Maintenance Department, by that office to City Engineering Department, and by that office back to the Health Department. He was then advised to consult a plumber.

The incidence of sewer backup continued thereafter intermittently and regularly. The Fletchers kept no record of the occurrences, but "a good shower" would result in a sewer backup of from one to four inches in the basement, and a "gully-washer," from two to three feet. The backups continued through 1972, and Fletcher recalled such incidents in 1972, 1974, 1977 and 1979—among other times. He specifically recalled a sewer backup on October 12, 1974, when the sewage backed up approximately one foot over the basement. That occasion destroyed the furnace motor and induced Fletcher to install a special rig so that the new motor could be disconnected should a backup recur. It was necessary, also, to contrive ceiling hooks to prevent articles stored in the basement from destruction. The recurrence of the backups dislocated the domestic activity: the washer and dryer were moved upstairs and the family members were obliged to bathe and to launder elsewhere when the furnace and hot water heater were extinguished by the sewage—and also to wear heavy apparel indoors during the winter. Memorabilia and other property were lost, a dryer had to be replaced. There were consequences to the persons of the Fletchers from the recurrent and prolonged episodes of expo-

sure to the raw sewage. Mrs. Fletcher experienced shortness of breath on those occasions, suffered nightmares, and ultimately became depressed. The noxious odors from the sewage caused Mr. Fletcher to heave and vomit; his eyes burned, and his lungs hurt. Also, each episode put him to the physical effort and discomfort of sewage removal—clad in boots, mask and rubber gloves—to clean out the accumulated fecal substances, tampons, and the like, and then to hose down the slime from the walls and basement and to sanitize the area with undiluted Clorox.

Over the course of the eleven years—from 1972 to 1983—Fletcher, at one time or another, reported the backup phenomenon to the municipal Health Department, the Public Works Department, the Sewer Maintenance Department, the Engineering Department, the City Council and to the Mayor of Independence. Fletcher appeared before the City Council on October 7, 1974 to advise them of "the problem in the neighborhood" and to enlist a solution. Fletcher also talked to a local television newscaster about the problem "[t]o try and get the city motivated after a report was done to do something." Nothing came of those initiatives. The years 1975 and 1976 were dry, and hence uneventful. In 1977—the year of the Plaza flood—however, the sewage in the basement backed up to a level of five feet. Two municipal employees came to the Fletcher home to investigate a complaint—Keeran, a health inspector, and Cox, a city engineer. Keeran went to the basement and there saw human debris and fecal matter, four to six inches deep, from the backup. He took samples and Health Department tests determined that the water was sufficiently saturated with fecal matter to be considered human sewage. Keeran recounted conversations with personnel of the Engineering Department that the sewer system in the area was not adequate to service the housing. He recounted conversations with personnel of the Sewer Maintenance Department that at times of heavy storm runoffs, the manhole cover [No. 40] in the intersection of Savage and Sea "stands up" on the water—as high

as three feet off the pavement—from the backflow. Keeran then made an appointment for the Fletchers with the City of Independence Mayor King "about this problem," and later accompanied them to his office. They conversed, and King told the Fletchers that the city would have the problem solved or "have an answer for them" within two weeks. The mayor ultimately advised the Fletchers to sue in the small claims court, and in 1979 the Fletchers brought such an action. The backups recurred in 1980, 1981, 1982, and 1983. The Fletchers dismissed the small claims action without prejudice, and this suit followed.

The plaintiffs presented witness Nissen, an analytical chemist with Aztec Laboratories. He visited the Fletcher home on four occasions to test samples from the sump basin in the basement. The analysis disclosed 760 fecal coliform organisms in the 100 mms. sample tested. The witness concluded that there was some contamination in the Fletcher basement caused by the fecal matter.

The plaintiffs also called James F. Merideth, a licensed professional engineer, and Director of Public Works/Engineering for the City of Independence. He is responsible for the design and oversight of the construction of sanitary sewer lines. The witness testified that the sewer district which services the area of the Fletcher home was constructed in the period from 1954 to 1956. Merideth then described the configuration of the sewer system which serves the Savage and Sea area of the Fletcher home: at that intersection, three eight-inch pipes conjoin to empty into one eight-inch pipe. He testified that the Fletcher backups were caused, in part by storm water infiltration into the sanitary sewer system. Merideth distinguished between infiltration and inflow to a sanitary sewer system. Infiltration occurs when ground water comes into the sewer system from the water table, whereas inflow comes into the system from surface runoff. He testified that under the present sanitary sewer system design some infiltration is

expected, but no allowance for inflow is made. The cause of infiltration is the separation of the joints of a sewer line from long use or from the force of root growth.

Merideth testified that the City of Independence was familiar with the Fletcher backup problem. In 1978 a portion of the sewer system was rerouted by the construction of a line from manhole 15 to manhole 14 [one block north or uphill from Savage and Sea]. The purpose was to eliminate the hydraulic pressure and turbulence in manhole 30, and hence avoid the sewage backup into the lateral line in that area. The 1978 construction did not seal off the system, but was merely a diversion of some of the sewage away from the area where the three eight-inch pipes conjoined at the Savage and Sea location. The purpose was to eliminate the hydraulic pressure and turbulence in manhole 30, and hence avoid the sewage backup into the lateral lines in that area. The result was to move the point of hydraulic pressure concentration further down the system. Merideth testified that in addition to that response at correction, roots were removed and pipes grouted in the areas of infiltration.

In early 1980 the city developed a plan to construct a new sewer main. The plan, as Merideth described, was to install a manhole adjacent to manhole 30 [in the intersection of Savage and Sea] and from there to run a twelve-inch sewer line parallel to existent eight-inch line for a distance of 3900 feet. The contract for that project was awarded in November of 1983 at a cost of $135,735.50. The construction was an item in the municipal Capital Improvement Budget at least twice between 1980 and the time bids were taken, but was not funded either time. Merideth testified that the proposed construction could have been designed from an engineering point of view as early as 1972, and then at a lesser cost. He gave opinion that the completed construction will eliminate the backups at Savage and Sea. The construction work, however, had not yet begun at the time of trial. It was the opinion of Director of Public Works/Engineering Merideth, nevertheless, that since there were "no backups

during normal flow," the sewer line which services the Fletcher home was adequate to serve the additional hook-ups permitted by the city after 1972.

The plaintiffs Fletcher also presented witness Glen B. Hemby, Superintendent of Sewer Maintenance for the city. The problem at the Savage and Sea area, he testified, was caused in part by storm water infiltration. The sewer maintenance records note twelve television inspections of the area sewer lines from as early as May of 1974 through April of 1981. The records of that department showed one complaint by the Fletchers—in 1978. Some 499 pipe joints were grouted in the Savage and Sea area—96 of them on the street on which the Fletcher residence stood. That was done, he said, not from need, but as a desperate attempt to solve the backup problem in the area. The department also performed root repair work in that area some 23 times between 1972 and 1983. He also described the 1978 construction of the pipe from manhole 15 to manhole 14 to divert the flow of sewage away from the Savage and Sea area. Superintendent Hemby also testified the repairs and other maintenance performed between November of 1981 and October of 1983 on manhole 30 in the intersection of Savage and Sea. He said that area had received special attention from his department, and that he had personally attempted to solve the sewage backup problem there with all knowledge, experience and skill. He testified to a copy of a letter dated October 17, 1977 from Mayor King to the Fletchers which mentioned the sewer-line diversion later constructed in 1978, and which expressed the hope that that installation would relieve the backup problem. Hemby acknowledged that the grouting of sewer lines and the application of smoke tests to determine defects were not undertaken in the Savage and Sea area until *after* April 1, 1981, when the present suit was brought by the Fletchers against the city. To the very date of trial, Hemby also acknowledged, the city had not succeeded in the elimination of the backups in the Fletcher basement: "It

seems that they still have stoppages even though we have grouted the area." It was his testimony that the city had the engineering and construction ability in 1972 to install a sewer line which would solve the sewage backups into the Fletcher basement.

Exhibit No. 23 received from the plaintiffs was a memorandum dated November 6, 1979, from [then] city employee Snelling to Director Merideth concerning the sewer problems in the Savage and Sea locality. It recited that even during a period of "extremely dry weather conditions," television inspection of the pipes disclosed a rate of infiltration of "eight to ten gallons per minute." The memorandum suggested: "A bypass could be installed to not only relieve back-up, but to allow visual monitoring of the amount of flood water to be controlled."

The deposition testimony of expert witness Prather was also read into evidence. He was an engineer in the design and construction of sewer systems. He gave opinion that it was scientifically possible for the city to abate the Fletcher sewage problem by the installation of a larger outflow line to carry away the extraneous efflux. The installation of a new sewer pipe in the Savage and Sea area would have been as feasible in 1972 as in 1984—as the construction under contract now proposes. It was reasonably practical, as well, for the city to run smoke tests from 1973 and thereafter, and to have grouted the pipes in front of the Fletcher home in years 1974 and thereafter. He concluded that the City of Independence did not use the sewer which services the Fletcher home in a reasonable manner.

The final witness for plaintiffs was John F. Sweeny, a real estate appraiser. He inspected the Fletcher home in July of 1983 and thereafter. In his opinion, the fact that the basement was subject to sewer backup made the basement useless to owners, except for storage at their peril. The use of the basement as a laundry room was lost, as well. The incidence of sewage backup reduced the amount of rent the premises could command. He calculated that the loss of the use of the basement compounded by the percentage of the loss of the upstairs area resulted in lost rental value of $11,979.31 over the eleven-year backup period. The Fletchers sold their home in December of 1983 for $26,000.

The defendant City of Independence presented as the sole witness engineering technician Stuart Cox. His primary duty was the design of sanitary sewer systems. He was familiar with the Savage and Sea intersection and was there in 1977, after the Plaza flood. The city, he testified, did not have the ability to conduct smoke tests before 1981, but in May of that year they were undertaken. The purpose of the regimen is to detect storm water infiltration into the sanitary sewer system. The tests disclosed "a possible deteriorated manhole, sanitary sewer manhole." They also disclosed certain unauthorized appurtenances on private structures and premises—such as roof drain downspouts—which direct storm runoff into the sanitary sewer system. His office, as a result, notified the property owner and the witness Cox persevered with them to correct the irregularity. It was his opinion as design expert that an eight-inch pipe sanitary sewer system was adequate for the Savage and Sea area, and to his knowledge, accomplished the purpose fully. The design of a twelve-inch line [the new construction contract calls for] to run parallel to the existent eight-inch line was "to accommodate any possible infiltration we might have in the line." He concluded, moreover, that new development along 23rd Street [to the south] in the last ten years did not contribute to the Fletcher sewer backup, but that the eight-inch line in place was an adequate conduit. It was his conclusion that the city had done everything reasonably possible to solve the backup problem. He attributed the overload of the sanitary sewer system during periods of rainfall to the inflow of rainwater to the system and not to any inadequacy of the line as a sewer system. He acknowledged that the municipality had available the engineering skill to design the new proposed system as early as 1971. He

testified, nevertheless, that it would not have been reasonable to design the twelve-inch sewer system in 1971, nor in 1975, but is now reasonable in 1984. Cox ascribed as reason: "We have reached our limitations on solving the problem, so we have to go as far as we possibly can now."

Director of Public Works, Merideth, testified again, in rebuttal. Merideth referred to yet another memorandum from then city employee Snelling concerning the Savage and Sea area which identified root growth as the "No. 1 problem in the area." Merideth confirmed that root control in the main sewer lines, as well as infiltration, was the responsibility of the City of Independence. Merideth reconfirmed that "[i]nfiltration is a major problem" [in the Savage and Sea area]. He restated that the line capacity there was sufficient by design standards "[f]or a sanitary sewage flow." It was not sufficient, however, in times of appreciable rainfall.

The plaintiffs Fletcher submitted their theory of recovery under MAI 22.06—the verdict director for private nuisance—and recovered damages for special injury, and also for injury to their property by the measure applicable to a temporary nuisance. The City of Independence argues that the evidence fails to prove a private nuisance and that, in any event, "whether sewer systems are constructed or maintained properly should be a matter of negligence law," and not of nuisance law, and hence subject to the doctrine of comparative fault as declared in *Gustafson v. Benda*, 661 S.W.2d 11 (Mo. banc 1983). The City argues alternatively that if, nevertheless, the municipal conduct constituted a nuisance, it was nuisance "based upon negligence," and hence under *Gustafson* the jury was required to compare the fault of the principals and apportion damages—a direction the court failed to submit.

I

Sufficiency of the Proof

An action for private nuisance rests on tort liability. *Merrill v. City of St. Louis*, 83 Mo. 244, 255 (1884). The gist of the action is the unreasonable interference with the use and enjoyment of land. *Rebel v. Big Tarkio Drainage District of Holt City*, 602 S.W.2d 787, 791[7–10] (Mo. App.1980). Nuisance describes an effect, not a cause of tort liability, so that conduct antecedent to the interference may not be relevant to remedy. *Frank v. Environmental Sanitation Management, Inc.*, 687 S.W.2d 876, 880[1, 2] (Mo. banc 1985). The law of nuisance acknowledges and accommodates two rights in conflict: the right of a property owner to control and use land for personal benefit and interest, and the right of the public and adjoining land owners to prevent an unreasonable use which substantially impairs their peaceful enjoyment of land. *Clinic & Hospital, Inc. v. McConnell*, 241 Mo.App. 223, 236 S.W.2d 384, 390[3–6] (Mo.App.1951). The *unreasonable use* element of the cause of action involves a balance between the rights of adjoining property owners. *Looney v. Hindman*, 649 S.W.2d 207, 214[9] (Mo. banc 1983). It may facilitate a pleader to articulate the nuisance effect—the unreasonable use—by averments in terms of breach of duty of care, intentional conduct, or other theory of action, but it is the unreasonable use determined upon a balance of interests, and not a formal category of action, which determines a nuisance. *Frank* 687 S.W.2d at 880[1, 2]. Thus, unreasonable use—and hence private nuisance—may be proven *per se:* a use unreasonable as a matter of law from the very circumstances. *Clutter v. Blankenship*, 346 Mo. 961, 144 S.W.2d 119, 121[11] (Mo. 1940). A negligent act may constitute a nuisance. *Rebel v. Big Tarkio Drainage District of Holt City*, supra, 602 S.W.2d 787. An intentional act may constitute a nuisance. *Bower v. Hog Builders, Inc.*, 461 S.W.2d 784 (Mo.1970). A nuisance may be found from a continuous, known invasion, where after complaint and notice of damage, the landowner continues to offend and refuses to correct or discontinue the misuse. *Vaughn v. Missouri Power & Light Co.*, 89 S.W.2d 699 (Mo.App.1935). In such a case, the nuisance is deemed

intentional. *Hawkins v. Burlington Northern, Inc.,* 514 S.W.2d 593, 602[15, 16] (Mo. banc 1974).

 A municipal corporation which lays out a system of sewers and drains exercises a proprietary function and owes a duty of reasonable care in its construction and maintenance not to injure private property. *Cook v. Kansas City,* 358 Mo. 296, 214 S.W.2d 430, 432 (1948); *Geiger v. City of St. Joseph,* 198 S.W. 78, 79 (Mo. App.1917); *Woods v. Kansas City,* 58 Mo. App. 272, 278–279 (1894). The power to construct a system of sewers, moreover, does not authorize the municipality to create a nuisance. *Windle v. City of Springfield,* 320 Mo. 459, 8 S.W.2d 61, 62[6, 7] (1928); McQuillin, Municipal Corporations § 31.22 (3rd ed. 1983). Thus, the municipality is answerable for private injury from its system of sewers and drains, whether from negligence or from the unreasonableness of the use—negligence or not. *Lucas v. City of Louisiana,* 173 S.W.2d 629, 636[10, 11] (Mo.App.1943); *Windle v. City of Springfield,* supra. In either case, the municipality owes the duty to correct the dysfunction in a drain or sewer within a reasonable time after notice, and failure incurs liability to the person damaged. *Woods v. Kansas City,* supra; *Geiger v. City of St. Joseph,* supra.

 On these principles, a sewer backup into private premises may be actionable either for negligence [*Lawin v. City of Long Prairie,* 355 N.W.2d 764 (Minn.App.1984) or for nuisance [*City of Holdenville v. Griggs,* 411 P.2d 521 (Okla. 1966)]. In *City of Holdenville,* the owner sued the city for damages to her premises when sewage carried by the municipal lines backed up through her lateral line into the residence. The owner notified the city repeatedly of the backups and of the inadequacy of the system, but the city failed to remedy the condition. The court held [quoting *City of Ada v. Canoy,* 198 Okla. 206, 177 P.2d 89 (1947)] 411 P.2d at 524:

"While it is true as contended by defendant that a municipality is not an insurer of its sewer system, and while there is authority to the effect that a city cannot be held liable in damages because of error in judgment as to the size of drains or sewers necessary to carry away sewage or surface waters, it is generally held that if, after such sewers and drains are constructed, it becomes evident that the same as constructed are inadequate to perform the functions contemplated, and after due notice thereof it fails to take steps necessary to remedy such condition and continues thereafter to operate the same in such manner as to constitute a nuisance, it will be held liable ... In such case liability will attach irrespective of the question of negligence on its part."

*See also City of Ludlow v. Commonwealth,* 247 Ky. 166, 56 S.W.2d 958 (1933). That approval of the nuisance remedy to impose liability upon a municipality, after notice, for the uncorrected and continued invasions of a private residence as an unreasonable use of the sewer easement implicitly determines the balance of interests between the two uses, prima facie, in favor of the householder so aggrieved.[1] *Windle v. City of Springfield,* 320 Mo. 459, 8 S.W.2d 61, 62[6, 7] (1928); *Clark v. City of Springfield,* 241 S.W.2d at 107[14]; *see also Lee v. Rolla Speedway, Inc.,* 494 S.W.2d at 355[2] and Restatement (Second) of Torts, §§ 826 et seq. (1977). That essential principle imposes liability, moreover,

---

1. In terms of explicit analysis, the municipal construction and maintenance of an adequate sewer system sustains the general health and welfare, so that the social utility and benefit from such an activity is obvious and undoubted. The role of a private dwelling as the personal sanctum in our social scheme, on the other hand, is a value the law prizes and diligently protects against invasion. *Paddock v. Somes,* 102 Mo. 226, 14 S.W. 746, 749 (1890); *Clark v.*

*City of Springfield,* 241 S.W.2d 100, 106 (Mo. App.1951). A municipal sewer system so constructed or maintained as to be inadequate for its function, of course, subverts its intended purpose of benefit, and when that condition invades private premises and interferes with that source of enjoyment, the law strikes the balance, prima facie, in favor of the harm. *Lee v. Rolla Speedway, Inc.,* 494 S.W.2d 349, 355[2] (Mo.1973).

whether the antecedent conduct of the actor constitute a breach of duty—and hence, negligence—or simply unreasonable use, and hence, nuisance. *Lucas v. City of Louisiana*, 173 S.W.2d 629, 636[10, 11] (Mo.App.1943); *Kinlough v. City of Maplewood*, 201 S.W. 625, 628 (Mo.App.1918); *Geiger v. City of St. Joseph*, 198 S.W. 78, 79 (Mo.App.1917); *Woods v. Kansas City*, 58 Mo.App. 272, 279 (1894). The evidence before the court proved an appreciable interference by the municipality with the ordinary enjoyment by the Fletchers of the property or, restated in terms of the balance of interests rationale: circumstances of use which resulted in harm of such gravity as to offset its utility, and so made a prima facie case of nuisance for submission to the jury. *Clark v. City of Springfield*, 241 S.W.2d at 107[14].

The sewer backup invasions of the Fletcher premises were known to the municipality from some time in 1972 until 1983, when the owners sold the home. In that span of time, that recurrent condition was reported to the municipal Health Department, Sewer Maintenance Department, Engineering Department and the Public Works Department. The City Council was confronted, and the mayor, himself, gave them audience and personal assurances of remedy. A spate of memoranda between municipal employees and the several departments mention the problem at Savage and Sea, and describe the efforts to come to a diagnosis and correction: smoke tests, regrouted pipes, root removal, sewer-line diversion, among other procedures—and all inadequate to restore the sewer system to reasonable use in that area. There was evidence also that the essential cause for the backups was known to the municipality, and that the procedures undertaken by the city were a palliation and not a solution. The backups were the result of the hydraulic pressure and turbulence in manhole 30 at Savage and Sea where three eight-inch pipes conjoined to flow into one eight-inch pipe. That system of pipes, according to municipal Civil Engineer Merideth, although adequate during "normal flow," was susceptible to infiltration from the ground water table and inflow of rainwater—as an entry into the sewer pipes facilitated by the separation of the joints from long use and neglected maintenance—and hence the overburden and backups. Merideth gave this qualification: that although the sewer line capacity was sufficient by design standards, it was not sufficient "in times of appreciable rainfall." There was other testimony—not only by Fletcher that even a "good shower" would result in a backup of up to four inches, but a city departmental memorandum that even during "extremely dry weather conditions," there was an undue rate of infiltration into the sewer pipes. City witness Cox confirmed also that rainfall, as well as ground water infiltration, caused the overload of the sanitary sewer system. It was the consensus of the witnesses with technical knowledge, that the new twelve-inch sewer line authorized for construction parallel to the existent eight-inch sewer line at Savage and Sea would eliminate the backups in that area. They agreed that the engineering and construction technology for that solution was already available to the municipality in 1972, and at a lesser cost. City witness Cox agreed that the twelve-inch pipe was sufficient "to accommodate any possible infiltration we might have in the line," although he disagreed that it would have been reasonable to design that system in 1972. Cox acknowledged, nevertheless, that the past attempts at correctives of the existent sewer system to prevent backups at Savage and Sea simply did not avail, "so that we have to go as far as we possibly can now"—that is, install a system with greater conduit capacity. That corrective [a practical and final solution as all the witnesses agree] was one open to the municipality from the beginning and at less expense, but deferred for some eleven years while the backup invasions and damages recurred at the Fletcher residence. The evidence sufficed to prove that the backups from the sewer system were reported to the municipality repeatedly over eleven years. The evidence sufficed to prove that the cause of the backups was an

inadequate sewer system, a condition known to the municipality, but never corrected. The evidence sufficed to prove that the continued use by the municipality of the sewer easement, for eleven years after notice, in such a manner as to interfere with the Fletcher enjoyment of the premises was unreasonable. The evidence proved a prima facie nuisance. *Windle v. City of Springfield*, supra; *Clark v. City of Springfield*, supra.

 The City argues, nevertheless, that nuisance was not proven because the only cause shown for the backups was "extraordinarily heavy rainfalls," a condition which does not impose liability upon a municipality unless the damage would not have resulted but for an obstruction or improper maintenance in the drains or sewer system. That merely restates the full contention of nonliability—a contention resolved against the municipality. The evidence was abundant that the cause of the backups was simply the inadequacy of the conduits at Savage and Sea where the fluid contents of three eight-inch pipes were emptied into one eight-inch pipe. The inference was plain that the incapacity of the single eight-inch pipe to receive the effluents of the other three constituted an obstruction. The inference was plain, also, that whatever the adequacy of the system at the time of construction some thirty-five years earlier, the imperfect joints of the conduits, from long use and unsuccessful riddance of root growth and other maintenance, allowed an undue infiltration to enter and burden the sewage system—and hence induce the backups. The evidence is equally clear, that an ordinary rain—"a good shower" in the terminology of witness Fletcher—would produce a backup in the basement from one to four inches. There was a more severe backup [to about a five-foot depth] in 1977 as the result of the Plaza flood, but that phenomenon apart, the basement was invaded with sewage water after merely a usual rain. As late as April 1, 1983, as witness Nissen testified, the recurrences continued—and at the time of his presence, the floor of the basement was covered with from four to five inches of fecal contamination and sewage. These episodes were not consequent upon "extraordinarily heavy rainfalls," as the City proposes. But if so, the City was not excused. If by unreasonable use of the sewer easement—a system become inadequate from overburden and want of effective maintenance—"the sewer was allowed to become and remain defective, and this condition actively caused the damage, then the city was liable, even though there may have been extraordinary rains which joined with [the municipal conduct] in producing the damage." *Geiger v. City of St. Joseph*, 198 S.W. at 79; *Woods v. Kansas City*, 58 Mo.App. at 280.

## II

### The Applicability of Comparative Fault

The City argues alternatively that if the municipal conduct constituted a nuisance, it was nuisance "based upon negligence," and hence under *Gustafson* the jury was required to compare fault and apportion damages. We assume for decision the premise of argument: that the damage to the Fletchers was from a nuisance negligently caused, and conclude nevertheless, that the want of instruction to the jury on any question of fault by the Fletchers was not error.[2]

---

**2.** An unreasonable use, perpetuated and uncorrected even after complaint and notice of damage, is deemed intentional. *Hawkins v. Burlington Northern, Inc.*, 514 S.W.2d 593, 602[15, 16] (Mo. banc 1974); Restatement (Second) of Torts, § 825, *comment d*, (1977). In that event, the comparative fault principle does not appertain to diminish the damages of a nuisance claimant under the principles of the Uniform Comparative Fault Act, 12 U.L.A.Cum.Supp. 39 (1985) which the City invokes as the premise of argument. *See* Commissioners' Comment to § 1 of the Act. There was suggestion in the evidence that the sewer backups affected other residences in the Savage and Sea area, and caused by the same inadequacy of the municipal easement as caused the Fletcher damage. Thus, the conduct proven against the City of Independence had aspects of both a public and a private nuisance. *Smith v. City of Sedalia*, 152 Mo. 283, 53 S.W. 907, 911 (1899). In such a case, the evidence may prove an intentional invasion of

■ *Gustafson v. Benda* introduces the principle of comparative fault into Missouri jurisprudence. The opinion declares [661 S.W.2d at 15] "a comprehensive system of comparative fault for the trial of tort cases" and adopts the pure version of the doctrine enacted as the Uniform Comparative Fault Act, 12 U.L.A.Cum.Supp. 39 (1985). The doctrine operates, in an action based on fault, to diminish the amount awarded as compensatory damages in proportion to the contributory fault attributable to the claimant—but does not bar recovery altogether. Uniform Comparative Fault Act, § 1(a) The *fault* the Act addresses, by the very terms, encompasses "acts or omissions that are in any measure negligent or reckless toward the person or property of the actor or others, or that subject a person to strict tort liability" [§ 1(b)], but not intentional torts [Commissioners' Comment to § 1]. A nuisance, our law holds, describes an effect, not a cause of tort liability, so that the interference with the enjoyment of possession may result from conduct neither negligent, nor subject to strict liability, but intentional. *Frank v. Environmental Sanitation Management, Inc.*, 687 S.W.2d at 880[1, 2]. In that case, the Act does not appertain [Commissioners' Comment to § 1]:

the public interest, but only a negligent invasion of the private interest. In this case, there was no lack of attempt and effort by the City of Independence during the eleven years to relieve the pressure, congestion and backups in the Savage and Sea area sewer system, albeit ineffectual until construction of an additional and enlarged sewer system was authorized after more than eleven years of improvisation. In such a case, it would be fair to consider the continued invasions as negligent, rather than intentional, conduct, and thus subject to the rule of comparative fault—were the Act otherwise applicable to this trial. Uniform Comparative Fault Act, Commissioners' Comment to § 1 (1983); *see also* Restatement (Second) of Torts, § 840B *comment g. Public Nuisance.* We take up the negligent—intentional nuisance dichotomy in terms of the Uniform Comparative Fault Act, although we find that at the time of trial *Gustafson v. Benda* did not yet govern, because the distinction also bears on the mitigation question the City raises and we address in the course of opinion. We determine, for response

For certain types of torts, such as nuisance, the defendant's conduct may be intentional, negligent or subject to strict liability. In the latter two instances the Act would apply, but not in a case in which the defendant intentionally inflicts the injury on the plaintiffs.

■ *Gustafson v. Benda*, by its terms, directs [at 15] that, except where the principals otherwise agree, comparative fault applies to tort cases "in which the trial begins *after* the date of the publication of this opinion in the advance sheets of the Southwestern Reporter" [emphasis added]. The opinion was published on January 31, 1984, the very day the trial of this case commenced, and hence *before* the comparative fault principle began to govern tort cases. Nor does the record show any concurrence to conduct the trial under the comparative fault principle. The City argues, nevertheless, that fairness prompts a remand for retrial under the new tort principle—or alternatively, that if the fault of the Fletchers may not be given account to reduce damages under the new doctrine, then contributory negligence should bar the recovery altogether. The argument cites no precedent from our decisions to validate a contributory negligence defense to a nuisance cause of action in tort—whether or not negligently caused.[3] The Uniform

to these questions, that the nuisance was negligently caused.

**3.** A recent decision of our supreme court en banc, *Looney v. Hindman*, 649 S.W.2d 207 (Mo. banc 1983), however, intimates modification of that established doctrine. That case was a claim against upper owners for the collection and discharge of surface waters in destructive quantities upon the property of the lower owners so as to damage their swimming pool. The recovery was submitted on the theory of nuisance. The trial court allowed evidence to prove that the plaintiffs could have avoided the damage to the swimming pool by the installation of an underlying gravel bed. The plaintiffs on appeal complained that the evidence erroneously introduced concepts of contributory negligence into a claim for damages for the nuisance tort. The court responded [at 215]:

Evidence of the plaintiffs' fault ... is appropriate in determining the element of causation, quite apart from any issue of contributory negligence.

Comparative Fault Act, as we note, now allows evidence of the fault of a claimant to diminish damages under proof of a non-intentional nuisance. Commissioners' Comment § 1 (1983). That enactment—and *Gustafson v. Benda*—however, did not govern the trial of this cause of action. The entire argument of fault—whether under the comparative or contributory theory of tort—lacks substance altogether. There simply was no evidence of fault or negligence by the Fletchers: they did not know of the inadequacy of the sewer system at Savage and Sea when they purchased the premises in 1971, nor did they do anything to incur that condition.[4] Nor did the City submit an instruction on either theory, to reduce damages or as an affirmative defense, nor was any such contention preserved for review in the motion for new trial.

## III

### MITIGATION OF DAMAGES

The City of Independence contends also that under the antecedent law, as well as under the Uniform Comparative Fault Act, a person injured by a nuisance owes a duty of reasonable effort or expenditure to avoid or mitigate anticipated damages. Therefore, the contention goes, it was error for the trial court to refuse the tender of evidence that Fletcher was advised by municipal engineers to install a check back-

flow valve in the lateral between the main sewer and the home as a means to prevent the flow into the basement, but refused. The trial court rejected the tender of evidence on the theory that our law does not impose upon a nuisance plaintiff the duty to mitigate damages. We decide that the rule of avoidable consequences appertains to nonintentional nuisances, but that the offer of proof by the City was not sufficient to tender the issue, and hence the exclusion of the evidence was not error.

The case was tried, to reiterate, under the tort law antecedent to *Gustafson v. Benda* and principles of comparative fault. The principle of mitigation of damages by avoidance of consequences has been a component of our tort law since *Douglass v. Stephens*, 18 Mo. 362 (1853). In that case goods of the plaintiff stored in a basement were damaged when employees threw rubbish into a sewer so as to cause backup into the cellar. The plaintiff, after discovery of the water made no effort to save the goods from damage, although an effort would have prevented loss altogether. The jury found for the defendant, and the plaintiff complained that the evidence that diligent effort would have averted the damage was erroneously allowed. The court adapted the rule in a breach of contract to a claim in tort to hold [at 366]:

[I]f the party injured can protect himself from damage at a trifling expense or by

The portent of that rationale is to validate evidence of the fault of the plaintiff in a nuisance action, not for the purpose of defense, but to prove want of causation—that is, that the damage occasioned to the plaintiff was not from the unreasonable use of land by the defendant. We conclude therefore, that at the time this case was tried, contributory negligence did not govern to bar a nonintentional nuisance plaintiff from recovery.

Whatever that decision may have augured, nonintentional nuisances are now governed by the comparative fault rule of *Gustafson v. Benda* and the Uniform Comparative Fault Act it adopts and integrates as a tort principle. Thus, the rule now governs that evidence of the fault of a claimant as it bears on causation as the basis of liability and hence on damages, goes to diminish recovery and not to defeat it. Uniform Comparative Fault Act, § 1(b) Commissioners' Comment—*Causation* (1983).

4. The argument does not contend that any conduct of the Fletchers contributed to the damages they claimed and recovered. The argument, rather, alludes to the testimony of City witness Cox that the backups into the Fletcher premises were caused, in part, by infiltration of storm water into the sanitary sewer system—the result of drainage from spouts and other unlawful appurtenances maintained on private structures. That argument—that the damage to the Fletchers was not altogether from conduct attributable solely to the municipality—however, does not invoke considerations of comparative fault, but the principle that a tortfeasor may not be held for injury done by independent actors, but only for damages the tortfeasor, itself, occasioned. *Somerset Villa, Inc. v. City of Lee's Summit,* 436 S.W.2d 658, 664[8, 9] (Mo.1969).

any reasonable exertions, he is bound to do so.

It continues as the general principle of negligence law that an injured party owes the duty of reasonable effort to avoid or minimize the damages. *Evinger v. Thompson,* 364 Mo. 658, 265 S.W.2d 726, 734[17, 18] (banc 1954); *Brown v. Kroger Company,* 358 S.W.2d 429, 432[2] (Mo.App.1962).

The trial court, nevertheless, on the premise that *Paddock v. Somes,* 102 Mo. 226, 14 S.W. 746 (1890) removes the nuisance tort from the operation of the rule of mitigation, rejected a tender of proof that the Fletchers, by the insertion of a backflow valve between the lateral and the main, could have prevented the entry of the sewer fluids into the basement, and hence the consequent damages. In *Paddock,* the defendant installed a drain pipe from his premises to the grounds upon which the plaintiff lived so that the water, drainage and sewage emitted there. The plaintiff had previously recovered a verdict and judgment against the defendant for a like wrong. The effluxions from the drain pipe continued onto the grounds of the plaintiff and he sued to abate the nuisance and for damages for the injury. The defendant had judgment and the plaintiff complained of the instruction that the plaintiff was not entitled to recover if the jury believed he could have prevented the injury "by a reasonable exertion, and at trifling expense." 14 S.W. at 799. The court noted that the evidence established that the nuisance proven was a continuation of a nuisance already adjudicated, but still unabated. The conduct of the defendant, moreover—the construction of a drain designed to redirect the flow of surface water onto the premises of the plaintiff—was a direct invasion and a trespass. In those circumstances, where the conduct of the defendant was merely a continuation of a nuisance already adjudicated, the court concluded [at 749], "the only question left for determination was the quantum of the damages to be recovered." In those circumstances, also, of the collection of surface water into an artificial channel and emission onto adjacent land—a direct trespass—the injured plaintiff could not be denied recovery on the basis [at 749] "that the plaintiff himself could obviate the injury at a trifling expense."

 The recovery in *Paddock,* in short, was for an intentional tort—damage occasioned both by the perpetuation of a nuisance already adjudicated and by a direct trespass of premises. The rule in *Paddock* that one who collects surface water into an artificial channel for discharge upon the land of another to his injury—and so commits a trespass as well as a nuisance—cannot impose upon the party so injured the duty of reasonable effort to mitigate the damage continues in effect. *Grant v. St. Louis, I.M. & S. Ry. Co.,* 149 Mo.App. 306, 130 S.W. 80, 82 (1910). In this respect, *Paddock* conforms to the evolved rule of avoidance of consequences in tort actions. The general principle itself expresses the public policy which discourages persons from the waste of their resources, physical or economic. Restatement (Second) of Torts, § 918 *Avoidable Consequences, comment a.* (1977). It is for this reason that an injured person will not be permitted to impose upon another, even a tortfeasor, the consequences of a choice not to limit the loss. J. Stein, Damages and Recovery: Personal Injury and Death Actions § 127 (1972). That policy, however, does not excuse the consequences of a harm intentionally inflicted merely because the person injured neglected to take precautions to avoid or mitigate the damages. The law so roundly condemns such conduct as to refuse to allow such a tortfeasor to assert the simple neglect of the victim to allay the damages so flagrantly incurred. Prosser and Keeton on The Law of Torts § 65 p. 462; § 67, p. 467 (5th ed. 1984); Restatement (Second) of Torts, § 918(2) (1977).

 *Paddock* was a case of direct trespass and intentional nuisance. It was not subject, therefore, to the unqualified application of the rule of mitigation declared in *Douglass v. Stephens,* 18 Mo. 362 (1853), that a victim of tort [in that case a negligent tort] is bound to "protect himself

from damages at a trifling expense or by any reasonable exertions." [18 Mo. at 366]. The nuisance the Fletchers proved against the City of Independence, however, was a nonintentional nuisance, and on principle, evidence of the neglect of the plaintiffs to avoid damages by a reasonable effort or expenditure was admissible. That is the clear intimation of *Looney v. Hindman*, 649 S.W.2d at 215 [13, 14]. The refusal of the trial court, on the authority and precedent of *Paddock*, to accept evidence tendered by the City to prove that the Fletchers by the installation of a backflow valve at modest cost could have limited the damages, therefore, was error. We determine, nevertheless, that the evidence tendered was not probative of mitigation, and hence the error was not prejudicial.

The offer of proof tendered by the City was in the form of excerpts from the depositions of plaintiff Fletcher and of Director of Public Works/Engineering Merideth, and of testimony other questions, if allowed, would have elicited. The testimony *tendered from the Fletcher deposition* consisted of this colloquy:

Q. Were you ever advised to put on a flapper valve?

A. Yes.

Q. Who advised you to do that?

A. City.

Q. Do you recall when?

A. No. Oh, I—we was at a meeting at an office in the engineering department, Henderson was there, Snelling was there, Bill Bailey was there, might have been somebody else, I don't remember. And they asked me why didn't I put a flapper valve or a ball cock, and I pointed out the instance of the DeMitz', the LaSisters', the Borlands' all using different—those two systems, and they didn't work.

The testimony *tendered from the Merideth deposition* consisted of this colloquy:

Q. Are you aware of anything that the Fletchers are failing to do which is contributing to the backup in their basement?

A. I'm aware that they were advised to install some back-up plugs or check valves in their basement drains to prevent the back-up from coming into the basement.

The testimony from other questions to witness Merideth, if allowed, was also tendered in summary:

And I would make the further offer of proof that Mr. Merideth, if asked on direct examination, as to whether or not these check valves would be effective in preventing or minimizing back-ups would so testify that in his opinion they would be and have been.

. . . . .

Let me make one addition to the offer of proof. The lateral is owned by and is in exclusive control of the owner, and the City of Independence has no authority absent the permission of the property owner to effect that lateral, and it is the property owner's responsibility to maintain and service that lateral, and that will be Mr. Merideth's testimony in this case and as a part of my offer of proof.

. . . . .

I would further make an offer of proof that the evidence of the expense of the expenditure for the insertion of such a ball cock would be under $50.00 for materials in the opinion of witnesses Stu Cox and James Merideth.... That in the opinion of the witness James Merideth, the cost of the installation and the labor would be $175.00.

 The function of an offer of proof is not only to enable the trial court to rule advisedly, but also to enable the court on appeal to determine the propriety of the evidence the offer seeks to elicit. *Merk v. St. Louis Public Service Company*, 299 S.W.2d 446, 449[3, 4] (Mo.1957); *K.R.(S.)D. v. C.D.S.*, 646 S.W.2d 428, 432[9, 10] (Mo. App.1983). To that end, an offer of proof must be presented with certainty and detail sufficient to demonstrate its quality as relevant, material and probative evidence. *Kinzel v. West Park Investment Corpora-*

*tion,* 330 S.W.2d 792, 795[1–3] (Mo.1959); *Seibel-Suessdorf Copper & Iron Mfg. Co. v. Manufacturers Ry. Co.,* 230 Mo. 59, 130 S.W. 288, 293 (1910). An offer tendered in terms of a general summary of the evidence tends to obscure the line of proof, and is properly refused—both at the trial and on the appeal. *Northwestern Stove Repair Co. v. Cornwall,* 148 Mo.App. 605, 128 S.W. 535, 537 (1910). The approved practice requires that the questions be propounded to a witness who is present and has taken the stand. *Karashin v. Haggard Hauling & Rigging, Inc.,* 653 S.W.2d 203, 205[3–5] (Mo. banc 1983).

■■■■■■ In this case, of course, the trial court rejected the offer of proof not from want of formal or substantive sufficiency, but from a mistaken premise of law. The question remains whether the tender as presented was probative of the mitigation issue: that is, that the evidence offered bears to prove that the Fletchers could have avoided the damages from the nuisance by the installation of a backvalve [or flapper valve, or ball cock] in their lateral to the main at a modest cost, but unreasonably refused. The only testimony by the Fletchers tendered in the offer of proof was an excerpt from their deposition that they were advised "to put on a flapper valve" by city engineer employees at a meeting, at which time Fletcher pointed out to them that these very systems had been installed by several of the neighbors similarly affected, "and they didn't work." It is the unmistakable sense of this evidence—evidence tendered by the defendant City—that the devices [in the circumstances of the Savage and Sea area sewer system dysfunction] were ineffective to prevent the recurrent backups. The burden to prove the issue of mitigation is on the tortfeasor. *Braun v. Lorenz,* 585 S.W.2d 102, 108[6, 7] (Mo.App.1979). That is to say, the offer of proof of the defendant City of Independence must show, prima facie, that the installation of the valve device was a reasonable method of prevention of damage to the Fletcher residence, and that the Fletcher refusal to make installation was unreasonable. We may assume

that the offer of proof was framed as favorably as possible. *Rutledge v. Baldi,* 392 S.W.2d 244, 248[3–5] (Mo.1965). It tenders as fact no more than that the Fletchers knew that the valve was a device recommended by the city engineers as a means to prevent backups, but that the very device—and comparable others—was ineffective to the purpose in that sewer system area. That evidence, taken as fact, allows no inference that the Fletcher refusal to make installation was unreasonable. It is not probative of the issue of mitigation.

■■■■■■ Nor was any more probative on the issue either the Merideth deposition excerpt or the summary of his proposed testimony that "if asked on direct examination, as to whether or not these check valves would be effective in preventing or minimizing back-ups would so testify that in his opinion they would be and have been." The question of mitigation, however, poses the issue of the avoidance of damages by reasonable effort *under the circumstances of the particular case* —and not whether the precautions injured party neglected to take generally are effective. *Cline v. City of St. Joseph,* 245 S.W.2d 695, 702[10–12] (Mo.App.1952). Thus, the tendered Merideth testimony that such check valves "would be effective in preventing or minimizing back-ups" does not amount to an assertion that such a device would be effective for that purpose in the circumstances of the intense hydraulic pressure and turbulence in manhole 30 and the Savage and Sea area the Merideth trial testimony described. An offer of proof must encompass *all* facts necessary to establish its admissibility. *Byam v. Kansas City Public Service Co.,* 328 Mo. 813, 41 S.W.2d 945, 952[15, 16] (1931). The offer of proof was incomplete, and hence not probative on the issue of mitigation, for yet another reason. The rule of mitigation [contrary to the argument of the City] does not operate to defeat recovery—as in the case of contributory negligence—but only to reduce the damages the injured party could have avoided by reasonable effort

under the circumstances of the case. *Cline v. City of St. Joseph,* 245 S.W.2d at 702[10, 12]. The rule of avoidable consequences comes into operation only after the legal wrong has occurred, "but while some damages may still be averted, and bars recovery only for such damages." Prosser and Keeton on The Law of Torts § 66, p. 458 (5th ed. 1984). The damages to the Fletchers from the nuisance were both recurrent and cumulative—and extended from 1972 until 1983, when they sold the residence. The offer of proof tenders no evidence as to *when* the feasibility of the check valve device—and hence the means to mitigate damages—was disclosed to the Fletchers. The rule of mitigation bars recovery only as to those damages reasonable precaution could have avoided, in these circumstances, when the means to mitigate were reasonably known to the Fletchers. That essential component of the proof was not an element of the offer, and hence the tender was not probative of the issue. The exclusion of the evidence therefore was not prejudicial to the defendant. *Kinzel v. West Park Investment Corp.,* 330 S.W.2d 792, 795–96 (Mo.1959).

## IV

### The Damages Awards

The issue of damages was submitted by an instruction on the model of MAI 4.01. That form of instruction allows a return of both property and personal damages and is the approved submission for a temporary nuisance. *Spain v. City of Cape Girardeau,* 484 S.W.2d 498, 505[5] (Mo.App. 1972). The jury awarded the Fletchers, husband and wife, $18,000 for property damages. In addition, the jury awarded special damages: $15,000 to Mr. Fletcher and $6,000 to Mrs. Fletcher.

 The evidence unquestionably proved an abatable nuisance, and hence the submission of the damages under MAI 4.01 was proper. A nuisance which results from the operation of a municipal sewage system is abatable if at the time the damages accrued it was scientifically possible and reasonably practicable for the munici-

pality to have abated the nuisance. *Flanigan v. City of Springfield,* 360 S.W.2d 700, 704 (Mo.1962); *Hillhouse v. City of Aurora,* 316 S.W.2d 883, 887[1] (Mo.App.1958). That element of the proof was made by the testimony of Director of Public Works/Engineering Merideth, Superintendent of Sewer Maintenance Hemby and expert witness Prather. They all acknowledged and confirmed that the installation of a larger outflow line to carry away the excessive effluent—the solution the City of Independence finally undertook at the time of trial by the installation of a parallel twelve-inch pipe to supplement the eight-inch sewer line at the Savage and Sea intersection—was reasonably practicable and scientifically feasible in 1972 when the damages from the nuisance commenced to accrue.

The City of Independence contends, nevertheless, that all the component awards are excessive, unsupported by evidence and otherwise induced by speculation. The City argues that the awards are so excessive as to bespeak passion or prejudice of the jury, and so require reversal. The City argues alternatively for remand with direction that the trial court exercise the remittitur function. The rule of remittitur has been abolished in Missouri. *Firestone v. Crown Center Redevelopment Corp.,* 693 S.W.2d 99, 110 (Mo. banc 1985). The gross size of a verdict per se, moreover, does not prove the passion and prejudice which vitiates a verdict. *Skadal v. Brown,* 351 S.W.2d 684, 690[16–18] (Mo. 1961); *Blevins v. Cushman Motors,* 551 S.W.2d 602, 615[21] (Mo. banc 1977). The City cites no trial event as would cause a jury to return an exaggerated verdict. Nor can the contention that the awards were not supported by evidence be sustained.

 The plaintiffs proved an abatable nuisance and so were entitled to recover "the depreciation of the rental or usable value of the property during the continuance of the injury." *Spain v. City of Cape Girardeau,* 484 S.W.2d 498, 505[5] (Mo. App.1972). In addition, the occupants of a home who suffer interference with the en-

joyment of premises from a temporary nuisance may recover for any actual inconvenience and physical discomfort which materially affects their comfort or health. *Schmidt v. Paul,* 554 S.W.2d 496, 499[7] (Mo.App.1977). The City acknowledges that expert testimony established the value of the loss of use of the Fletcher premises at $11,979.31, and that there was proof otherwise of $400 in personal property loss. The City argues nevertheless that these proven losses did not justify an award of $18,000. There was other evidence of property loss however, to which the Fletchers could not attribute an exact value: a wedding album and other such memorabilia. The jury had the discretion to set that value [*Flanigan v. City of Springfield,* 360 S.W.2d at 705]. The exercise of that discretion was found by the trial court as not contrary to the weight of the evidence, and so stands on appeal. *Firestone v. Crown Center Redevelopment Corp.,* 693 S.W.2d at 110[14].

The City argues also that the award to the husband of $15,000 and to the wife of $6,000 for special damages were not proven. The evidence contradicts that contention. The episodes of the invasions of the Fletcher premises over the eleven-year period were not only revulsive, but noxious, unhealthy and a constant interference with the enjoyment of a home. The backups gave off the stench and unsightliness of a cloaca. It required Fletcher to wade through the sewage, first to dispose of the solids, and then to drain, scrub and sanitize the basement and walls. The floods extinguished the hot water heater and furnace so that the family was required to find some other place to bathe and launder. They resorted to heavy clothing during the winter in order to keep warm. The washer and dryer appliances had to be removed from the basement to the kitchen to protect them against the sewage. The family was dislocated from the kitchen as the customary dining area for want of room. The plans to remodel the home and to convert the basement into a recreation area were abandoned. Furthermore, each of the Fletchers were physically affected by the recurrent backup episodes. Mrs. Fletcher experienced shortness of breath and difficulty breathing when the backups occurred. She grew more despondent as the invasions recurred, and suffered nightmares that her children were falling into the sewage. Mr. Fletcher testified that the clean-up episode which each backup occasioned caused his stomach to heave and then to vomit, his eyes to burn and his lungs to hurt. This evidence sufficed to prove the special damages awarded to each of the Fletcher occupants. *McCracken v. Swift and Co.,* 265 S.W. 91 (Mo.1924).

## V

### The Verdict Director

The nuisance cause of action was submitted by Instruction No. 5, drawn on the model of MAI 22.06:

Your verdict must be for plaintiffs if you believe:

First, the plaintiffs used their property as a residence, and

Second, defendant owned and operated a sanitary sewer system which served plaintiffs' residence, and

Third, sewage backed up from defendant's sanitary sewer system into plaintiffs' residence and this substantially impaired plaintiffs' use of their residence, and

Fourth, such use by defendant of its sanitary sewer system was unreasonable.

The City finds two errors in the formulation of the instruction as a verdict director: (1) the failure to require the jury to find that the nuisance was abatable: (2) the failure to require the jury to find that "the defendant's maintenance of the sanitary sewer system was the proximate cause of the plaintiffs' injury." The City contends, in any event, that "the evidence failed to support submission of an instruction for an abatable nuisance as a matter of law"—and hence, presumably, the cause of action was not submissible as a nuisance.

In two recent decisions the supreme court en banc approached, and then accomplished, a synthesis of the law of private nuisance in Missouri. MAI 22.06

expresses that synthesis. *Looney v. Hindman,* 649 S.W.2d 207 (Mo. banc 1983) confirmed that the gist of private nuisance is the use of property in a manner which, in the circumstances, unreasonably interferes with the rights of other landowners. It is a balance of interests between the landowners—and not any particular species of conduct, negligent or otherwise—which determines the reasonableness or unreasonableness of the use, and hence nuisance or not. MAI 22.06 validly formulates and submits that essential gist of the cause of action. *Looney,* at 214[9]. *Frank v. Environmental Sanitation Management, Inc.,* 687 S.W.2d 876 (Mo. banc 1985) then examined MAI 22.06 against the contention that the instruction, as formulated, does not submit the quality of the tortfeasor conduct, but only the result of that conduct as, on balance, reasonable or unreasonable. *Frank* recapitulated the law of Missouri as developed in Missouri, and concluded that [at 880[1, 2] ] "[n]uisance is an effect rather than a cause of tort liability and conduct antecedent to the interference may be irrelevant." Nuisance, in short, depends upon the degree of danger of the use, and not the degree of care in that use. *Frank* [at 880] cited *Looney* to confirm that the *unreasonable use* element of the nuisance cause of action balances the rights of the adjoining property owners to derive the danger of that use. The causation element of the nuisance cause of action, the *Frank* exposition continues [at 881], is the use of the property by the defendant in such a [dangerous] manner as to cause injury to the property of the plaintiff. MAI 22.06, *Frank* concludes, is a proper formulation of the nuisance submission—whether an intentional or nonintentional nuisance. 687 S.W.2d at 882.

▋ MAI, therefore submits all the essential elements of the nuisance cause of action. Instruction No. 5, contrary to the contention of the defendant City, follows that pattern. The element of causation, which the City contends the instruction lacks, is posited to the jury by paragraph Third. That proposition reasonably requires the jury to find, prior to verdict, that the City used its sewer system in such a manner as to back up into the Fletcher residence and so caused substantial impairment in their enjoyment of the residence. Paragraph Third was phrased in terminology approved later in *Frank* [at 879, 881] for the submission of causation in a nuisance instruction. The City argues once again that the evidence by its witness Cox that a number of homedwellers illicitly funnelled storm water into the sanitary sewer at Savage and Sea proved as a matter of law that such conduct, and not any use made of the sewer system by the City, was the cause of the backups in the Fletcher residence. The evidence was substantial, rather, that the want of maintenance of the sewer lines in the Savage and Sea area, unjointed from age and other causes so as to allow root growth to invade the pipes and obstruct the flow and the inadequate capacity of the main line in the area to accommodate both the sewer effluent and the infiltrated and inflowed water caused the backups. That sufficed to prove the element of causation of the nuisance. *Clark v. City of Springfield,* 241 S.W.2d 100 (Mo.App.1951); *Windle v. City of Springfield,* 320 Mo. 459, 8 S.W.2d 61 (1928). The argument the City makes poses, not the causation of the nuisance, but the incurrence of damage. It poses the principle that a tortfeasor [here, the City] may not be held for injury occasioned by independent actors [here, the other home dwellers]. *Somerset Villa, Inc. v. City of Lee's Summit,* 436 S.W.2d 658, 664[8, 9] (Mo.1969) and *see* n. 4. That issue is not before us. There was not, in any event, any substantial evidence of the significance of that illicit outflow on the overload of the sewage system and consequent backups. Those practices were detected in 1981 after a series of smoke tests were conducted in the Savage and Sea area—a full nine years from the onset of the backups and accrual of damages by the Fletchers. The backups, moreover, continued even after the illicit practices were corrected. Thus, even were the issue of the apportionment of damages before us, there is no substantial evidence that the land uses of area home dwellers occasioned any of the damages sustained by the Fletchers.

The City contends also that the failure of verdict director Instruction No. 5 to require the jury to find that the nuisance was abatable invalidated the submission. MAI 22.06 does not require a proposition, as an element of the nuisance cause of action, that the nuisance is either abatable or permanent. The character of a nuisance as permanent or temporary [and therefore abatable] does not impinge on the proof of the basic cause of action: whether the land use by the defendant amounts to an invasion of a legal right of the plaintiff. It determines rather whether the nuisance, as proven, gives rise to a single cause of action or successive causes of action. It determines, therefore, the rule for the measurement of the damages.[5] The damages from a nuisance exist, however, only if a nuisance exists. *Newman v. City of El Dorado Springs*, 292 S.W.2d 314, 319[8, 9] (Mo.App.1956). MAI 22.06 submits that issue. A nuisance is permanent when the injury is fixed and goes to the whole value of the estate. *Shelley v. Ozark Pipe Line Corp.*, 327 Mo. 238, 37 S.W.2d 518 (1931). In that case, the damages are measured by the difference in market value immediately before and after injury. *Frank v. Environmental Sanitation Management Co.*, 687 S.W.2d 876, 883[10–13] (Mo. banc 1985). MAI 4.02 submits that measure. *Mondelli v. Saline Sewer Co.*, 628 S.W.2d 697, 699[4] (Mo.App.1982). A nuisance is temporary if abatement is reasonably and practicably possible. *Shelley v. Ozark Pipe Line Corp.*, 37 S.W.2d at 519[1]. In that case the damages are measured by the reduction in the rental value of the property during the continuance of the nuisance—as well as other incidents of damage—such as loss of comfort and health. *Schmidt v. Paul*, 554 S.W.2d 496, 499[7] (Mo.App. 1977). MAI 4.01 submits that measure. *Spain v. City of Cape Girardeau*, 484 S.W.2d 498, 505[5] (Mo.App.1972).

In this case the existence of a nuisance cause of action was submitted by an instruction on the model of MAI 22.06 and the damages were submitted by an instruction on the model of MAI 4.01, a pattern which accommodates the determination of damages for injury from an abatable private nuisance. MAI 22.06, as we note, does not require a proposition that the use by the defendant City constituted either a permanent or a temporary nuisance, hence the submission of damages by an instruction on the model of MAI 4.01 presupposes a judicial determination that the evidence proved an abatable nuisance to the exclusion of a permanent nuisance. The defendant City argues, nevertheless, that the question of permanent or abatable nuisance was one of fact for the *jury*, and not one of law for the court—and cites *Flanigan v. City of Springfield*, 360 S.W.2d 700, 704[5] (Mo.1962) to that effect. *Flanigan* was an action or nuisance against the municipality for injury to a landowner from the operation of the sewage disposal plant. The question was whether the injury to the plaintiff was the result of "the inherent nature of the [sewer system] operation"— and hence a permanent nuisance—or whether it would have been "scientifically possible and reasonably practicable" to have abated the nuisance—and hence a temporary nuisance. The court concluded [360 S.W.2d at 704] that it was a jury question "whether it was scientifically possible and reasonably practicable" for the municipality to have abated the nuisance. The defendant cites only *Flanigan* on that contention, yet *Flanigan*—as to that declaration —sports no lineage. It cites no precedent and enjoys no successor.

We do not doubt that past cases have from time to time allocated the function to determine the character of a nuisance— whether permanent or temporary—to a jury. *See e.g., Blankenship v. Kansas Explorations*, 325 Mo. 998, 30 S.W.2d 471, 478[3] (Mo.1930). Whatever may have been the requirements of the past practice, the scheme of MAI now allocates that adjudicative function to the court. MAI 22.06 as formulated is sanctioned as the verdict

5. The distinction between a temporary and a permanent nuisance affects the statute of limitations and right of a ·successor in interest to maintain a nuisance action. *See* Weaver, *The Law of Private Nuisance In Missouri*, 44 Mo.L. Rev. 20, at 70 (1979).

director for all nuisances, intentional and nonintentional, temporary or permanent. *Frank v. Environmental Sanitation Management, Inc.*, 687 S.W.2d 876, 879–883 (Mo. banc 1985); *Looney v. Hindman*, 649 S.W.2d 207 (Mo. banc 1983); *Bower v. Hog Builders, Inc.*, 461 S.W.2d 784, 797[3] (Mo.1970).

We dispel the contention of the City on an even more fundamental ground: *all the evidence* —that of the single municipal witness, Cox, included—agreed that it was scientifically possible and reasonably practicable for the city, as early as 1972, when the Fletcher damages began to accrue, to have abated the backups by the installation of a twelve-inch pipe in the Savage and Sea area. That was the solution the City finally adopted, but only after eleven years of recurrent interference with the enjoyment by the Fletchers of their domestic premises.

The judgment is affirmed.

All concur.