[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Barbara Blackburn, brought this action made returnable to the court on July 20, 1993. She alleged that the defendant, Miller-Stephenson Chemical Company, Inc., caused soil and water contamination on property she owns at 42 and 44 Backus Avenue, Danbury thereby causing her damages. The first count of the plaintiff's amended complaint alleges that the defendant negligently discharged volatile organic compounds into the environment. The second count alleges a cause of action in negligence pursuant to §§ 22a-427, 22a-430 and 22a-454 of the General Statutes. The third count alleges that the defendant created a nuisance because its discharge of volatile organic compounds migrated through the groundwater to the plaintiff's property and well. The fourth count lies in trespass in that the plaintiff alleges that the migration of the contaminants was a physical invasion of her property. The fifth count claims reimbursement for remediation or clean-up costs pursuant to §22a-452 of the General Statutes. In the sixth count, the plaintiff seeks declaratory and equitable relief for the protection of the public trust in the air, water and natural resources from unreasonable pollution, alleging that the defendant impaired or destroyed the public trust in these resources pursuant to General Statutes § 22a-16. The plaintiff claims the following relief:
1. money damages, in the amount of present and/or permanent diminution of the market value of plaintiff's property;
2. money damages for plaintiff's present and future loss of rental income;
3. money damages, multiple damages where appropriate, and/or an order requiring defendant to reimburse plaintiff for all costs incurred or to be incurred for investigation, removal, and other mitigation of the contamination of plaintiff's property;
4. Legal expenses and court costs incurred in the recovery of plaintiff's costs for investigating, containing, removing, monitoring or mitigating the pollution and contamination of plaintiff's property;
5. An order requiring defendant to remediate all environmental contamination present at plaintiff's property; CT Page 10130
6. Such other and further relief as the court deems just and equitable.
In a subsequent amendment to the first amended complaint, the plaintiff seeks the following relief:
7. An order requiring the defendant to indemnify her for any costs or expenses she may be subjected to as a result of defendant's contamination of the property;
8. Damages for aggravation and worry.
The court took evidence on three days commencing September 23, 1997. Thereafter, the parties exchanged briefs. The parties agreed that, if the court were to determine that attorney's fees and costs were to be awarded, a separate evidentiary hearing would be held.
The defendant raises the following special defenses: that the plaintiff failed to state a claim upon which relief may be granted; that the plaintiff failed to mitigate her damages; her claims are barred by the applicable statute of limitations; damages were caused by a supervising, intervening cause; her own negligence was greater than the defendant's negligence; that her recovery should be diminished pursuant to § 52-572h of the General Statutes; that the actions of third parties caused the harm; that the plaintiff's costs were unreasonable and therefore not recoverable; her claims are barred by the doctrines of laches, waiver, unclean hands and equitable estoppel.
Because the special defense alleging that the plaintiff's claims are time-barred is dispositive of certain counts, the court addresses that issue first.
 FIRST AND SECOND COUNTS
General Statutes § 52-577c[1] is the applicable statute of limitations for personal injury or property damages caused by exposure to a hazardous pollutant, "whether based on negligence or some other theory." Goldblum v. The Pittson Co., Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. 126252 (April 24, 1996, Stevens, J.) (16 Conn. L. Rptr. 512); Millbrook Owner's Association v.Hamilton Std., Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 556416 (June 11, CT Page 10131 1996, Hennessy, J.) (17 Conn. L. Rptr. 178). The legislative history of § 52-577c indicates that the purpose of this statute "was to extend the statute of limitations for suits to recover damages caused by toxic waste pollution." Goldblumv. The Pittson Co., supra, 16 Conn. L. Rptr. 512.
The statute begins the limitation period "when the injury or damage complained of is discovered or in the exercise of reasonable care should have been discovered." The plaintiff claims that the limitations period did not begin until she had actual notice of the contamination in 1993. The defendant claims the period began when she acquired the property in 1991 because the DEP cleanup order was a matter of public record at that time and had she adhered to standards of commercial real estate transactions, she would have discovered the problem then. "Reasonable care" is not defined in § 52-577c. The plaintiff claims to have been an "innocent landowner" as defined in §22a-452d[2] at the time she acquired the property to support her claim that she did not know or have reason to know that the property was contaminated. In Starr v. Commissioner ofEnvironmental Protection, 236 Conn. 722, 675 A.2d 430 (1996), the court, interpreting § 22a-452d(B) (iv), which provides a defense to "one who acquires property through inheritance or bequest," said that the subsection was "intended to protect people who have the ownership of polluted property involuntarily thrust upon them." Id., 738. This case does not help her position, however, because her acquisition of the property in a divorce settlement cannot realistically be characterized as having the ownership thrust upon her.
Rather, it is subsection (B)(i) that provides the standard most applicable to her situation. This subsection protects from liability a landowner who "does not know and has no reason to know of the spill or discharge, and inquires, consistent with good commercial or customary practices, into the previous uses of the property." It does not require that every acquisition of property conform to commercial standards, only to "customary practices," which would depend on the particular scenario. In interpreting similar language in CERCLA (Comprehensive Environmental Response, Compensation Liability Act of 1980), 42 U.S.C. § 9601
et seq., the district court in U.S. v.Pacific Hide Fur Depot, Inc., 716 F. Sup. 1341 (D. Idaho 1989), noted that Congress created a three-tier standard for commercial transactions, private transactions, and inheritances CT Page 10132 and bequests, and what constitutes a reasonable inquiry in a private transaction is a factual question. Id., 1348. To qualify under the CERCLA standard, "the defendant must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability. For purposes of the preceding sentence the court shall take into account any specialized knowledge or experience on the part of the defendant, the relationship of the purchase price to the value of the property if uncontaminated, commonly known or reasonably ascertainable information about the property, the obviousness of the presence or likely presence of contamination of the property, and the ability to detect such contamination by appropriate inspection." 42 U.S.C. § 9601
(35) (B); U.S. v. Pacific Hide Fur Depot, Inc., supra, 716 F. Sup. 1347.
With the analogous standard of an "innocent landowner" in mind, the court looks to the particular facts of the plaintiff's situation to determine what a reasonable inquiry would have been at the time she acquired this property.
The court finds the following facts. The plaintiff, Barbara Blackburn, owns 3.6 acres of land located at 42 and 44 Backus Avenue, Danbury. She obtained this property on May 24, 1991 in settlement of a bitter marital dissolution action between her and George Valluzzo.
There is a building on the property with an apartment on the second floor and a small business on the lower floor. During the 1960s in the early years of her marriage, Blackburn lived at 42 Backus Avenue.
At the time of the dissolution, Valluzzo was president, or at least an officer of Danbury Centerless Grinding, now DCG Precision Manufacturing, a business he operated through most, if not all, of the marriage. Blackburn had no connection with her husband's business. Her husband did not share his work or business activities with her. She did not work in the business for compensation or otherwise at the time. She had not visited the property for least 10 years prior to owning it. However, she knew in general that manufacturing operations were going on in the larger building before 1991, but had no first hand knowledge of what the operations were. CT Page 10133
At the time of the divorce settlement, Blackburn was represented by counsel. She agreed to take the Backus Avenue property which Valluzzo had listed for sale at an asking price of $700,000.00. She did not visit the property before she accepted it despite knowing that her husband had operated a machine shop there. In 1988 she obtained an appraisal limited to the estimated fair market value of the property. Since the dissolution was contentious, it is unclear why she accepted Valluzzo's representation that he had not filled in any wetlands or buried hazardous materials on the property. In 1991 she neglected to have the appraisal updated and to reconcile the difference of $150,000 between the appraised value and her husband's asking price. She failed to do a "phase one" investigation which would have included visiting the site, noting what was on it, what type of chemicals or compounds the machine shop had used, the source and condition of the water supply, the direction of ground water flow, and the state of the septic system. She did not learn that, in 1988, the Connecticut department of environmental protection (DEP) detected the presence of contaminants in a well on the property. She obtained insurance policy; a title search, if any, did not reveal notice of local health code violations pertaining to contamination of the well water at 44 Backus Avenue. While taking these steps would have indicated contamination only on her property, they might have led to the discovery that the source of certain contaminants was the Miller-Stephenson property.
After taking title to the property, Blackburn went to the property primarily to meet with the tenant, and to enter into an oral lease with him. She found clutter and debris around and inside the building. She took no steps to clean up the property except to remove an oil tank. It is also unclear as to what discussions, if any, Blackburn had with the broker who listed the property in 1991 about the process utilized when a buyer seeks to purchase industrial property. At that time Michael Ryer had been a commercial real estate and sales person for approximately eighteen years and handled ninety to ninety-five commercial properties at any given time. He was aware that the purchase of industrial property requires environmental studies in order to obtain financing and title insurance, and that a "phase one" investigation is routine where the proposed transaction involves property where manufacturing occurred. Ryer thought the asking price of $700,000 too high. Blackburn did not reduce the price in view of the cost of a phase one to a prospective buyer. She chose not to discover what a phase one investigation might reveal nor its ramifications to her when she sold the property. The asking CT Page 10134 price remained $700,000 until shortly before trial when it was reduced to $550,000. An offer to purchase the property at that price was made but no binder signed.
On July 7, 1992 the DEP informed Blackburn's tenants, Mr. and Mrs. Whitlock who resided at 44 Backus Avenue, that benzene had been detected in their drinking water supply. They were instructed to use bottled water. In April 1993 the DEP sent Blackburn a letter regarding the presence of benzene in the drinking water of 44 Backus Avenue. The premises were supplied with bottled water by the state and by the defendant. In September 1993 the premises were hooked up to the public water supply. Meanwhile, Blackburn had conversations with HRP who stated that soil venting on her property would clean up the contamination. When Whitlock moved, and Blackburn began to recognize the seriousness of her position, she contacted counsel and sought legal remedies.
The court finds that Blackburn did not act reasonably in 1991. She knew the historical use of the property. The fact that she obtained the property through negotiations in a divorce settlement did not lessen her burden to seek out information affecting the value of the asset.
For the foregoing reasons the court finds that the plaintiff did not bring this action within the time provided by section General Statutes §§ 52-577c. Therefore, the first and second counts sounding in common law and statutory negligence are barred by the statute of limitations.
 THIRD AND FOURTH COUNTS
The third and fourth count, in nuisance and trespass respectively, are not barred by the statute of limitations because they are continuing.
The four elements of a private nuisance are: "(1) the condition complained of had a natural tendency to create danger and inflict injury upon person or property; (2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; (4) the existence of the nuisance was the proximate cause of the plaintiff's injuries and damages."Filisko v. Bridgeport Hydraulic Co., 176 Conn. 33,35-36, 404 A.2d 889 (1978). A distinction is usually observed between permanent and temporary nuisances. "The character of a CT Page 10135 nuisance as permanent or temporary [and therefore abatable] does not impinge on the proof of the basic cause of action: whether the land use by the defendant amounts to an invasion of a legal right of the plaintiff. It determines whether the nuisance, as proven, gives rise to a single cause of action or successive causes of action. It determines, therefore, the rule for the measurement of the damages." (Brackets in original.)Fletcher v. City of Independence, 708 S.W.2d 158, 178
(Mo.App. 1986).
"A permanent nuisance has been said to be one which inflicts a permanent injury upon real estate; the proper measure of damages is the depreciation in the value of the property. . . . A temporary nuisance is one where there is but temporary interference with the use and enjoyment of property; the appropriate measure of damages is the temporary reduction in rental value, not depreciation in market value." (Citations omitted.) Filisko v. Bridgeport Hydraulic Co., supra,176 Conn. 40. "[W]here one builds or maintains upon his land a structure which creates a permanent nuisance upon the lands of another to his injury . . . the latter is entitled to recover once for all damages for the injury, measured by the resulting depreciation in the value of the property." Southern NewEngland Ice Co. v. West Hartford, 114 Conn. 496, 507-508,159 A. 470 (1932). A temporary, or continuing, nuisance has "traditionally been considered suitable grounds for equitable relief." Tomasso Bros. Inc. v. October Twenty-FourInc., 230 Conn. 641, 649, 646 A.2d 133 (1994). See alsoStratford Theater, Inc. v. Stratford, 140 Conn. 422,425, 101 A.2d 279 (1953) (measure of damages for temporary damages is cost to remedy the nuisance).
Whether a nuisance is permanent or temporary is also relevant for purposes of the statute of limitations and the rights of a successor in interest to maintain a nuisance action. Fletcher v.City of Independence, supra, 708 S.W.2d 178 n. 5. "In nuisance actions it is important, for statute of limitations purposes, to ascertain whether the invasion or interference is `permanent' or `continuous.'" Beatty v. Washington Metro. Area Transit Auth.,860 F.2d 1117, 1122 (D.C. Cir. 1988). "If the injury or wrong is classified as temporary, the limitation period starts to run only when the plaintiff's land or crops are actually harmed, and for purposes of the statute of limitations, each injury causes a new cause of action to accrue, at least until the injury becomes permanent. . . . This rule is especially applicable if the CT Page 10136 situation involves elements of uncertainty, such as the possibility or likelihood of the alteration or abatement of the causative condition. . . . The rule is predicated upon the defendant's ability and duty to abate the existing conditions which constitute the nuisance." (Citations omitted; internal quotation marks omitted.) Miller v. Cudahy, 858 F.2d 1449, 1453
(10th Cir.), cert. denied, 492 U.S. 926, 109 S.Ct. 3265 (1988).
The characterization of a nuisance is not necessarily dependent on whether the conduct that caused the nuisance has ceased. "[T]he life of an absolute nuisance exists as long as the nuisance lasts. When one creates such a nuisance is of no moment. As long as it exists, each instant of its continuance makes its creator liable for the injuries it occasions." Gryboski v.Tomasso, 11 Conn. Sup. 239, 241 (1942). See also Sundell v. Townof New London, 409 A.2d 1315, 1320 (N.H. 1979) (nuisance is abatable even if injuries continue after causative acts cease). Courts consider not only the permanent or temporary nature of the damages, but also the permanent or temporary nature of the causative factor, so `each case must be considered in its own factual setting."' Miller v. Cudahy, supra, 858 F.2d 1453. "Whether a nuisance is temporary or permanent is ordinarily a question of fact." Filisko v. Bridgeport Hydraulic Co., supra,176 Conn. 40. See also Mangini v. Aerojet-General Corp. ,230 Cal.App.3d 1125, 281 Cal.Rptr. 827, 841 (1991) ("Whether contamination by toxic waste is a permanent or continuing injury is ordinarily a question of fact turning on the nature and extent of the contamination.").
In order to recover on a common law trespass action, a plaintiff must show "ownership or possessory interest in property; the physical invasion, entry or intrusion by defendant which affects the plaintiff's possessory rights; intent to do that which causes the invasion and a direct injury to the plaintiff's property." Caltabiano v. Jimmo, Superior Court judicial district of Middlesex, Docket No. 67609 (May 5, 1995, Higgins, J.), quoting Avery v. Spicer, 90 Conn. 576, 579,98 A. 135 (1916). "An action for damages for trespass is a possessory action . . . for which title is only incidentally relevant. . . . When an injunction is sought to restrain a trespass, however, title is an essential element in a plaintiff's case. Consequently, where both damages for trespass and an injunction are sought, both title to and possession of the disputed area must be proved." (Citations omitted.) McCullough v. Water-frontPark Assn., Inc., 32 Conn. App. 746, 749, 630 A.2d 1372, cert. CT Page 10137 denied, 227 Conn. 933, 632 A.2d 707 (1993).
"[A] trespass may be committed on, beneath, or above the surface of the earth [and] the phrase `surface of the earth' includes soil, water, trees, and other growths. . . . [A] trespass need not be inflicted directly on another's realty, but may be committed by discharging foreign polluting matter at a point beyond the boundary of such realty. . . . In order that there may be a trespass . . . [i]t is enough that an act is done with knowledge that it will to a substantial certainty result in the entry of the foreign matter [on the property]." (Citations omitted; internal quotation marks omitted.) Ahnert v. Getty,
Superior Court, judicial district of New London, Docket No. 537008 (April 4, 1997, Handy, J.).
"Generally, [a] statute which establishes a limitations period in an action for trespass to real property commences running at the occurrence of the first actual damages. The statute runs, in the case of a trespass or physical invasion of the surface of another's land, from the time of the unlawful entry. . . . However, [w]here a trespass is a continuing one, and not of that class of permanent appropriations to be assessed for all time at once, there may be successive actions for each continuance of the trespass. . . . A continuing trespass upon real property creates separate causes of action, which are barred only by the running of the statute against the successive trespasses, and not by the running of the statute from the time of the original trespass." (Citations omitted; internal quotation marks omitted.) Prescott v. Northeast Utilities, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 315423 (December 18, 1995, Ballen, J.).
"Injunctions are liberally granted in cases of continuing trespass." Pender v. Matranga, Superior Court, judicial district of Danbury, Docket No. 319129 (August 9, 1995, Riefberg, J.). "[I]n determining whether to grant injunctive relief, a more liberal rule is followed in cases of a permanent or continuing nuisance, such as a trespass." (Internal quotation marks omitted.) Walton v. New Hartford, 223 Conn. 155, 166,612 A.2d 1153 (1992).
Relevant to the claims of continuing nuisance and trespass the court finds the following facts proven. At all relevant times, the defendant, Miller-Stephenson, has been in the business of receiving chemicals in large quantities, blending and CT Page 10138 packaging them into smaller units and distributing them for industrial use. The business was started in Norwalk in 1955 by George Stephenson, a chemical engineer. It moved to its present location on Backus Avenue in Danbury in 1972. Stephenson purchased the site from a bankrupt pharmaceutical firm. Although there were several storage drums on the property at that time, he made no effort to determine if there was spillage from these drums and had them removed. He knew that the parking lot was stained but made no effort to determine the source of the stains. Instead, despite his expertise in the field of chemicals, he had it rebuilt and repaved without inquiring as to the source of the stains. He made no investigation regarding environmental conditions that existed on the property at the time of his purchase. In 1972 he repackaged epoxy resins and handled aerosols manufactured for him in Illinois. These aerosols were produced for the electronics and plastics industries and consisted of degreasing agents and circuit-board cleaners. Stephenson's business expanded, from purchasing resins and aerosols produced off-site to include production of aerosols on-site. Among the chemicals the company used were l, l, l-trichloroethane (TCA) and freons which were detected in Blackburn's well. The DEP subsequently found other chemical waste on the site including some chemicals Stephenson did not use.
Until 1986 waste products were stored in a warehouse because Stephenson did not have the staff or the motivation to dispose of the waste materials. (Exhibit 26, Stephenson deposition, p. 45.) They were disposed of after William Brennan was hired as purchasing manager in 1986. Brennan became operations manager shortly after being hired, a position he holds today. His responsibilities include environmental compliance although he had no specific training in environmental compliance before being hired. Before he arrived no contingency plan existed for dealing with problems arising from the use, storage or disposal of hazardous wastes and the company was not in compliance with regulations concerning storage or disposal of hazardous wastes. In 1986 there were four 5500 gallon tanks containing freon outside the building. Later drums outside the building contained TCA. Leaks that occurred fell on asphalt inside or outside the building during the process of transferring the chemical from the delivery truck to the tank. In April, 1986, the DEP conducted an inspection at the Miller-Stephenson site and cited the company for violations of the Hazardous Waste Management Regulations and referred the matter to the Attorney General. The defendant removed various empty drums of contaminants, including CT Page 10139 freon. Thereafter, HRP Associates, a consulting firm, developed various documents, including a contingency plan, to assist the defendant in complying with the environmental laws.
In late 1987 the DEP found contaminants in septic sludge and chemical waste at the defendant's property. The DEP ordered Miller-Stephenson to "investigate the extent and degree of groundwater, surface water and soil contamination resulting from chemical storage, handling and disposal activities at 55 Backus Avenue." (Exhibit "O", binder I, section 18, Order No. WS 4661). The DEP further directed the defendant to remediate, apply for discharge permits for discharges into the waters of the state and to implement a groundwater quality monitoring program. A timetable was established through July 31, 1989 for the accomplishment of these goals.
In January 1988, HRP began an investigation. HRP installed sub-surface borings and groundwater monitoring wells at the defendant's site and conducted tests. The laboratory results indicated the presence of TCA, l, l-dichloroethane, (1,1 DCA) a breakdown product of TCA, benzene, l, l-dichloroethylene, various forms of freon, and other contaminants. In addition, residential well samples taken on the Valluzzo (Blackburn) property contained TCA and l, l-dichloroethylene. By December 1989 the DEP was satisfied with the defendant's compliance with part of the order; in June, 1989 HRP submitted a hydrogeologic and engineering report to DEP. HRP recommended the following: that the contaminated soil be treated by soil venting; that the groundwater underlying the site be treated so as to strip the volatile organic chemicals which exceeded the state action levels; and (3) that four adjacent residences, including Blackburn's, be supplied with city water. The report estimated the cost of this remediation at $190,000 and estimated remediation could occur within six to nine months.
The DEP reviewed the report and requested additional information. HRP supplied further reports. Miller-Stephenson appealed DEP Order WC 4661. These steps, as well as changes in DEP personnel reviewing the matter, resulted in long delays which have allowed this situation to continue for nearly a decade.
The state has defined certain locations as GA or GB areas for the purposes of specifying environmental criteria as to soil and water. The GA classification applies to residential areas where potable water is required and the criteria are more stringent; CT Page 10140 the GB classification applies to commercial or industrial areas. See Regs., Conn. State Agencies § 22a-133k-l et seq. The plaintiff's property lies in a GB groundwater classification area. This designation reflects the historical presence of contamination because of the property's use as a machine shop and its proximity to Danbury airport. The defendant's property lies in a GA groundwater classification area. The findings of pollutants on its property require groundwater remediation at the Miller-Stephenson site. Connecticut has also established criteria for soil: direct exposure criteria for soil in the upper four feet where health can be harmed through ingestion and inhalation, and pollutant mobility criteria which is concerned with the mobility of contaminants in the upper 15 feet of soil where the upper layer of groundwater take on any contaminants in that layer of soil. In addition, Connecticut now has standards for surface water which regulates ground water discharge into a stream. In fairness to the defendant, it should be noted that some of these criteria did not exist before 1996.
The HRP 1993 report stated that the level of TCA found on the Blackburn property did not exceed the state's surface water, ground water or volatilization criteria. However, the report demonstrated that TCA, l, l-Dichloroethene (DCE,) benzene and chloroform, were found in some wells on the defendant's property to exceed the ground water protection criteria for the GA classification, as well as the surface water protection criteria and the volatilization criteria. These findings would require remediation on the Miller-Stephenson property.
In 1994 HRP documented the results of tests which indicated benzene in monitoring wells (MW) lB and lC on the Miller-Stephenson site exceeding the groundwater (GW) criteria level for the GA class; chloroform in MW lB exceeding the GW criteria: DCA exceeding GW criteria in MW 1B; and TCA and DCE in MW 3 near the defendant's driveway up gradient of the Blackburn well. DCE was also present in excess of standards in MW 6B and 6C. These findings continued to demonstrate a need for remediation on Miller-Stephenson property. These levels are significant because MW lA, lB and lC lie on the defendant's property boundary at Backus Avenue, directly across from, and up gradient to, the Blackburn property.
In 1996 and 1997 Leggette, Brashears and Graham, an environmental and ground water consulting firm, was retained by the plaintiff to perform tests on her well. The firm also collected water and sediment samples from a temporary stream on CT Page 10141 her property which is connected to a wetland. The levels of TCA, freons, DCE and DCA found in the water supply well decreased from 1996 to 1997. TCA and ethyl ether were found in the stream samples in 1996 and in a negligible amount in 1997. Chloroform and benzene found in the well in 1996 were below detectible limits in 1997. However, these results are dependent upon the levels of water in the well and stream and are inconclusive. Even the defendant's expert found that no trend was established with regard to the level of contamination. Except for ethyl ether, these compounds were found on the defendant's property in September 1993 in the monitoring wells closest to the Blackburn property and down gradient from the source of the Miller-Stephenson contamination.
The defendant's expert, Walter Gancarz of HRP, agreed that the unremediated soil on the defendant's site could likely lead to further groundwater contamination. He conceded that the source of freons in the Blackburn well was the Miller-Stephenson site. The defendant argues that Blackburn's property was already contaminated from Valluzzo's activities and the proximity to Danbury airport. However, levels of TCA and freons were non-detectible in the drums Blackburn had removed from her property. (Exhibit K). It is unlikely that TCA, DCA and DCE are from other sources. Since DCE and DCA are breakdown products of TCA, and since there is a high concentration of TCA on the defendant's site, it is more than likely that Miller-Stephenson is the source of those contaminants on the plaintiff's property. Both Gancarz and Buzea agreed that the plume of contamination from Miller-Stephenson could migrate to the Blackburn property for several years.
The DEP advised Miller-Stephenson to install interceptor wells along the line formed by MW 12, 13 and 14, closer to the source of the contamination. That proposal ignores remediation of any contamination existing between that line and Backus Avenue. The level of contamination will go undetected. Furthermore, a line of interceptor wells closer to the source will not remove contaminants from Miller-Stephenson's wells on Backus Avenue closest to Blackburn's property. Blackburn's property will still be the recipient of unwanted contaminants. For the foregoing reasons, the court finds that the defendant is creating a nuisance and maintaining a continuing trespass of contaminants to an unknown extent on the plaintiff's property. What remains to be determined is the appropriate remedy. CT Page 10142
 FIFTH COUNT
The fifth count is brought pursuant to General Statutes §22a-452. Section 22a-452 (a) provides for reimbursement for contamination removal costs where the pollution or contamination resulted from "the negligence or other actions of such person, firm or corporation." In Connecticut Resources RecoveryAuthority v. Refuse Gardens, Inc., 43 Conn. Sup. 83,642 A.2d 762, aff'd 229 Conn. 455, 642 A.2d 697 (1994), the court ruled that liability under § 22a-452 (a) must "be based on culpability and not merely causation."
The question of which statute of limitations, § 52-577 or § 52-577c, applies to claims under § 22a-452 was first addressed in Electroformers, Inc. v. Emhart Corp. , Superior Court, judicial district of Danbury, Docket No. 297891 (January 29, 1993, Fuller, J.) (8 Conn. L. Rptr. 307), in which the court concluded that § 52-577c would apply if the facts fit within that statute's definition of "damages caused by exposure to a hazardous substance." See also Sharp v. Wyatt,31 Conn. App. 824, 854-55, 627 A.2d 1347, aff'd, 230 Conn. 12, 644 A.2d 871
(1994) (determinig that the damages were not caused by "exposure" and applied § 52-577); Doty v. Mucci, 238 Conn. 800, 805,679 A.2d 945 (1996) (damages caused by petroleum outside definition of hazardous pollutant); Goldblum v. The Pittson Co., supra,16 Conn. L. Rptr. 512 (question of fact whether petroleum contaminant came under statute); Millbrook Owner's Association v.Hamilton Std., supra, 17 Conn. L. Rptr. 178 (applying § 52-577c
because damages caused by hazardous chemicals). As this case involves damages to real property caused by exposure to hazardous substances, the two-year statute of limitations in § 52-577c (b) applies, and the claim in the fifth count is barred for the same reasons as in the first and second counts. In addition, the claim in the fifth count is insufficient to state a cause of action under the statute, because the plaintiff has not alleged or proven that she has expended any money for cleanup or mitigation.
"Although the reimbursement scheme established under § 22a-452 was not part of the CWPCA [Connecticut Water Pollution Control Act] as originally enacted, the provisions of § 22a-452 must be read in a manner consistent with the overriding remedial purpose of the CWPCA. Whereas the commissioner of environmental protection is empowered to CT Page 10143 supervise, administer and enforce the CWPCA; General Statutes § 22a-424; § 22a-452 (a) broadly provides that any person, firm, corporation or municipality that contains, removes or otherwise mitigates the effects of contamination may seek reimbursement from any person, firm or corporation negligently responsible for such contamination. The clear purpose of this provision is to encourage parties to pay for remediation by providing them with an opportunity to recoup at least some of their remediation costs from others who are also found to be responsible for the contamination. Knight v. F. L. Roberts andCo. Inc., 241 Conn. 466, 474-75, 696 A.2d 1249 (1997). In Knight, the plaintiff sought recovery for money expended in a settlement with an adjoining landowner for damages caused by conduct on the plaintiff's property. The plaintiff alleged that the defendants had been responsible for the damage by their use of underground gasoline storage tanks. The court held that the plaintiff did not have to have directly engaged in cleanup activities, but could seek reimbursement for having paid a claim for someone else's remediation efforts. "In light of the inclusive language of §22a-452 and the broad remedial purpose of the statutory scheme of which it is a part, we conclude that the plaintiff is entitled to reimbursement from the defendants under § 22a-452 (a) for their pro rata share of the costs of containing, removing or otherwise mitigating the contamination of CLP's property if, asthe plaintiff has alleged, the defendants are also negligentlyresponsible for contaminating that property, and CLP used the$400,000 it received from the plaintiff to remediate thecontamination." (Emphasis added.) Id., 475-76. In other words, the statute requires that the remediation has already taken place. Other courts have held that a plaintiff seeking reimbursement under this statute must allege that he has taken action to remediate the alleged contamination of the property or that he has expended funds for such remediation. Hartt v.Schwartz, Superior Court, judicial district of New Haven, Docket No. 331912 (December 3, 1997, Blue, J.) (striking the count from a third party complaint); Albahary v. City Townof Bristol, Conn., 963 F. Sup. 150, 156 (D.Conn. 1997) ("by its terms, § 22a-452 allows reimbursement of remediation costs only if a plaintiffs has `contain[ed] or remove[d] or otherwise mitigate[d]' contamination"); Warner v.Kedah Corp. , Superior Court, judicial district of Middletown, Docket No. 72964 (September 20, 1995, Stanley, J.) (same);Bristol Shopping Plaza v. Vigilante Cleaners, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 338958 (December 1, 1989, Ripley, J.) (§ 22a-452 does CT Page 10144 not apply to actions for damages which may or may not be expended for cleanup purposes); Connecticut Light Power Co. v. Knight, Superior Court, judicial district of Windham at Putnam, Docket No. 33646 (July 23, 1993, Potter, J.) (party seeking reimbursement must undertake some action towards cleanup); but see Hartt v.Schwartz, supra, 20 Conn. L. Rptr 354, 360 (on a motion to strike a 22a-452 claim from the first party complaint, plaintiffs are "at least entitled to seek a declaration that any expenditures that they do undertake must be reimbursed by [the defendant]"). The plaintiff has not proven that she has taken action to remediate the contamination on her property caused by the defendant. She removed oil drums and other hazardous waste materials left on the property by her husband but these were not connected to the plume of contamination flowing from Miller-Stephenson. She is not entitled to relief for the costs of investigating the contamination.
 SIXTH COUNT
The sixth count is brought pursuant to General § 22a-16, which is part of the Environmental Protection Act (EPA). The EPA provides at General Statutes § 22a-15 that "there is a public trust in the air, water, and other natural resources of the state of Connecticut. . . . [I]t is in the public interest to provide all persons with an adequate remedy to protect the air, water, and other natural resources from unreasonable pollution, impairment or destruction." "The broad language of the act gives any person the right to bring an action for declaratory and equitable relief against pollution. It is clear that one basic purpose of the act is to give persons standing to bring actions to protect the environment." Belford v. New Haven, 170 Conn. 46,53-54, 364 A.2d 194 (1975). Any member of the general public can initiate an action "to raise issues involving the public trust in air, water, or other natural resources of the state." Bombero v.Planning Zoning Commission, 40 Conn. App. 75, 88,669 A.2d 598 (1996). Statutes such as section 22a-16 "are remedial in nature and should be liberally construed to accomplish their purpose." Manchester Environmental Coalition v. Stockton,184 Conn. 51, 57, 441 A.2d 68 (1981).
To establish a prima facie case under § 22a-16, the plaintiff must establish that "the conduct of the defendant, acting alone, or in combination with others, has, or is reasonably likely unreasonably to pollute, impair, or destroy the public trust in the air, water or other natural resources of the state. . . ." General Statutes § 22a-17; ManchesterCT Page 10145Environmental Coalition v. Stockton, supra, 184 Conn. 57-58. The defendant need not act negligently or otherwise culpably. Id., 59-60 (two parties' conduct, even when not acting in concert, may create unreasonable pollution even though each party alone is not acting unreasonably). This factor distinguishes § 22a-16
from § 22a-452, which requires culpable conduct.
"Once a prima facie case is shown, the burden of production shifts to the defendant. Under § 22a-17, `the defendant may rebut the prima facie showing by the submission of evidence to the contrary.' As stated in Ray v. Mason County Drain Commissioner, [393 Mich. 294, 311-12, 224 N.W.2d 883 (1975)], [t]he nature of the evidence necessary to rebut plaintiff's showing will vary with the type of environmental pollution, impairment or destruction alleged and with the nature and amount of the evidence proffered by the plaintiff. In some cases, no doubt, testimony by expert witnesses may be sufficient to rebut plaintiff's prima facie showing. While in other actions the defendant may find it necessary to bring forward field studies, actual tests, and analyses which support his contention that the environment has not or will not be polluted, impaired or destroyed by his conduct. Such proofs become necessary when the impact upon the environment resulting from the defendants' conduct cannot be ascertained with any degree of reasonable certainty absent empirical studies or tests.'" Manchester EnvironmentalCoalition v. Stockton, supra, 184 Conn. 60.
General Statutes § 22a-18 (a) provides that "[t]he court may grant temporary and permanent equitable relief, or may impose such conditions on the defendant as are required to protect the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction," and § 22a-18 (e) allows the plaintiff to claim attorneys' fees and costs.
The statute does not provide a specific statute of limitations. While § 52-577c seems the most applicable, not all cases that could be brought would necessarily be for injuries caused by exposure to hazardous pollutants. Moreover, by definition, any damages caused would have to be continuing to pose a current threat to the environment, and thus would be similar to a continuing nuisance. It also does not appear to require continuing conduct by the defendant. "The language of § 22a-16 . . . certainly appears to contemplate the possibility of a suit by a private citizen against an entity other than the state for the consequences of past pollution." CT Page 10146Hartt v. Schwartz, supra, 20 Conn. L. Rptr. 460.
The plaintiff has presented a prima facie case by showing that a protectible natural resource, water, is being impaired by the actions of the defendant. The plaintiff did not provide sufficient evidence to indicate the direction of groundwater flow on her property. However, the court can reasonably infer that contaminants on her property migrate to the wetlands on her property and from there to streams in the area. Buzea testified that contaminants in bedrock would travel through bedrock fractures. Since Miller-Stephenson has not excavated the soil which is the source of much of the contamination, and since no remediation has occurred on the Blackburn property it is not possible to determine the extent of the contamination.
In addition, § 22a-17 provides that the defendant's conduct may be considered acting alone, or in combination with other. "This recognizes the fact that a person may be polluting the environment but that his pollution alone may not be reasonable. But when his pollution is introduced into the environment in combination with others, it may become unreasonable." Manchester Environmental Coalition v. Stockton,184 Conn. 51, 60, 441 A.2d 68 (1981). The defendant did not succeed in rebutting the plaintiff's prima facie case by showing evidence to the contrary. The defendant, in fact, emphasized the proximity of the Danbury airport and also Valluzzo's activities as sources of contamination. However, it is the defendant's chemical pollution migrating from the source near the defendant's buildings that has brought TCA, DCE, DCA and freons onto the plaintiff's property. The fact that bottled water was provided to the residents of 49 Backus Avenue, which is adjacent to the defendant's property, is evidence that the contamination affected property other than the plaintiff's. In addition, the defendant failed to rebut the prima facie case by setting forth a "feasible and reasonable alternative." Id, 61-63. It cannot do so because it has failed to take even those steps which would remediate the source of the pollution on its own land. It has conducted no studies to determine the extent of the migration of pollutants onto adjacent properties and the means to remediate that pollution. Therefore, it has no alternatives to offer beyond having provided bottled water and sewer hook-ups.
For the foregoing reasons, the court finds that the plaintiff has sustained her burden of proving that the contamination violates the public trust. CT Page 10147
 CLAIMS FOR RELIEF
The plaintiff seeks money damages for the diminution of the fair market value of her property. In 1988 an appraisal of the property was done for her attorney in connection with the dissolution proceedings. The fair market value of the land was estimated to be $536,250 and of the building, $27,646 for a total estimated value of $563,896. The appraisal noted that the property value was adversely affected by being designated "inland wetlands." The real estate appraiser noted that the value of the property was 65% of the value of other commercial property in the area because of the lack of visibility, lack of city utilities and the overall appeal and marketability. No additional evidence was provided to indicate the increase in value, if any, due to the connection of the property to city water. Since an offer of $550,000 had been made at the time of trial, the court cannot find a diminution in value, especially since the plaintiff's realtor testified that he thought the property overpriced at $700,000.
The plaintiff also claims $4000 in lost rental payments. The plaintiff did not bear her burden of proving she suffered lost rental payments solely as a result of the well water contamination.
While the well water contamination may have been one of the factors involved in the tenant's move, it was not the only one. Whitlock wrote the plaintiff on January 26, 1993 stating that he would cease paying rent due to the problems with the well water, although at that time he was been receiving bottled water. However, two days before he wrote that letter, the plaintiff had met with him to discuss a problem regarding his dog. The dog was defecating and leaving a mess inside the building. Blackburn told Whitlock to solve the problem and clean up the mess. She returned on January 26 and found a worse mess and again advised the tenant to clean it up. The day after the tenant's letter, she visited the property and left Whitlock a note because the mess was worse still. On January 29 she returned and found the situation unimproved. She asked Whitlock if Valluzzo had "put him up to this" and whether the dog problem had been resolved. When Whitlock said it had not, she told him he was trespassing on her property. In March Whitlock left the premises. The plaintiff cleaned up some debris on the property, such as oil drums, in order to attract a new tenant. In September 1993 she rented both CT Page 10148 the apartment and the shop for the sum of $1000 per month. That tenant was still renting at the time of the hearing. Based on the foregoing, the court cannot find that Blackburn lost Whitlock as a tenant because of the defendant's actions. In addition she recouped her losses by virtue of the doubling of the rental amount. Had not Whitlock vacated she would not have had occasion to seek a new tenant.
The plaintiff also seeks legal expenses and court costs pursuant to General Statutes § 22a-18 (e). Based on the agreement of the parties, the court will have a hearing with regard to costs, including reasonable costs for witnesses, and a reasonable attorney's fee.[3]
Blackburn seeks an order requiring the defendant to remediate all environmental contamination present at her property. Miller-Stephenson argues, however, that Blackburn's site requires no remediation because it lies in a GB groundwater classification area, which permits the presence of higher levels of contaminants. Since Blackburn's property is now served by the public water supply, the argument is that groundwater there does not require remediation. In addition, the defendant posits that no remediation is necessary on Blackburn's property because there are no criteria regulating the presence of freons. While Connecticut has promulgated no standards for the presence of freons, other states, such as New York and New Jersey have issued such regulations. In addition, it is possible to do calculations to determine the level of freons. The defendant further argues that the level of TCA on Blackburn's property in 1993 did not exceed the state's surface water, ground water or volatilization criteria. The defendant argues that the GB criteria indicate that no remediation is necessary on Blackburn's property; that even where dichloroethylene was discovered on the plaintiff's property in excess of the pollutant mobility criteria, it was found in a well depth below 15 feet and that pollutants would not cause contamination through ingestion. The defendant further argued that the plaintiff's property was contaminated by industrial waste from Valluzzo's machine shop operation. After Blackburn took title to the property she shipped "waste oil" off the property. However, this waste oil was not a hazardous material as defined by the Connecticut regulations. None of these arguments, therefore, addresses the issue of whether Miller-Stephenson created a nuisance or caused a trespass on the plaintiff's property. CT Page 10149
The defendant is to remediate contamination at the plaintiff's property from TCA, DCE, DCA, freons and benzene. The remediation plan of the plaintiff's expert is to be implemented as to the installation and monitoring of three interceptor wells on Blackburn's property to determine the extent of the contamination, to prevent migration, and to remediate so that state and federal standards or calculable standards are not exceeded for the location and use of the property. The cost of installing these wells is estimated to be $10,000 and the cost of monitoring is be $2000 per month. These costs shall be borne by the defendant. In the event that sampling results demonstrate a need for additional wells or other remedial actions, the parties will seek the recommendation of DEP as to the steps to be taken. If there is no agreement, the parties will return to court for an evidentiary hearing as to the nature, extent, necessity and cost of such additional steps. The parties are to file a status report with the court 27 months from the date of this decision if they have not returned to court in the interim.
Further, the court enjoins the defendant from continuing to permit contaminants to migrate onto Blackburn's property in levels that exceed state or federal standards or calculable standards for the location and use of the property. The court recognizes that Buzea recommended the installation of three recovery wells on the defendant's property along Backus Avenue. Had the plaintiff requested remediation of Miller-Stephenson property, this court might have been inclined to so order. The court does not direct Miller-Stephenson to undertake specific remediation measures on its own property since its proposal is being reviewed by DEP. The defendant is ordered to advise DEP that any remediation plan must have as one of its objectives the termination of the nuisance and trespass of Blackburn's property.
The defendant certainly did not take the initiative in environmental compliance; it appealed an order of September 1992, an appeal which led to a consent order of February 1993 in which the defendant refused to admit findings that contaminants had been discharged from its property; while it exercised its rights it failed to take significant steps toward remediation such as soil venting that would have alleviated some of the contamination. Its delays were compounded by the delays in DEP's review of the case. Miller-Stephenson did not remove contaminated soil because it feared that, without DEP approval, it might be required to excavate once again if DEP decided that not enough soil had been excavated. Were the defendant to follow CT Page 10150 its expert's recommendation it could excavate the source area of the contamination and, if there were still contaminants present in levels that exceed standards, it could excavate incrementally until such levels were no longer present. In view of its reluctance to remediate, the defendant is further ordered to contact DEP monthly in order to expedite the review of its remediation plan.
As for the plaintiff's claim for indemnification, the court sees no reason to grant it at this time. The plaintiff will have that remedy available to her pursuant to General Statute §22a-452 if she expends her own funds in remediating in the future. There is insufficient evidence to award the plaintiff damages for aggravation and worry.
Accordingly, judgment may enter for the defendant on the first, second and fifth counts. Judgment shall enter for the plaintiff on the third and fourth counts. The court shall retain jurisdiction with regard to these counts to monitor compliance.
Judgment shall enter for the plaintiff on the sixth count. The award of fees and costs is to be determined by the court after a hearing.
LEHENY, J.