

# In the Missouri Court of Appeals
## Eastern District

### DIVISION THREE

| | |
|---|---|
| LARRY A. BEDFORD and<br>CAROL A. BEDFORD,<br><br>    Respondents/Cross-Appellants,<br><br><br>vs.<br><br><br>AUDRAIN COUNTY MOTOR<br>COMPANY, INC., d/b/a AUFFENBERG<br>MOTOR COMPANY OF MEXICO,<br><br>    Appellant/Cross-Respondent. | No. ED108993<br><br><br><br><br><br>Appeal from the Circuit Court<br>of Audrain County<br>17AU-CC00014<br><br><br>Honorable Kelly C. Broniec<br><br>FILED: August 3, 2021 |

Angela T. Quigless, P.J., Kurt S. Odenwald, J., and James M. Dowd, J.

## Opinion

This breach of lease and tortious property waste case arose when, upon the termination of a commercial lease of a surface lot, the lessee, which owned and operated a neighboring automobile dealership and had used the lot to display its automobiles for sale, removed six large light fixtures (the Lights) from the lot and disposed of them. Now, the lessee, Audrain County Motor Company, Inc., d/b/a Auffenberg Motor Company of Mexico (Auffenberg Motor),

appeals from the judgment in favor of the lessors, Larry A. Bedford and Carol A. Bedford (the Bedfords), for tortious property waste and breach of the lease agreement. Affirmed as amended.[1]

## Factual and Procedural Background

Viewed in the light most favorable to the judgment, the following evidence was adduced at trial[2]: Beginning in the early 1990s, the Carroll Motor Company, Inc., d/b/a Miller-Kehl Motor Company (Miller-Kehl) operated an automobile dealership out of its property at 202 W. Liberty Street, Mexico, Missouri. Miller-Kehl was owned by Chris Miller, Lee Kehl,[3] Fred Donaldson, and Jim Aungerer. During the early and mid-1990s, the owners of Miller-Kehl purchased adjoining real estate, including the real estate known as the Liberty Lot, which is the subject of this appeal.

Also in the mid-1990s, the owners purchased, erected, and installed the Lights on the Liberty Lot with the purpose of providing an illuminated automobile display lot for rent to the adjacent automobile dealership, which at the time was Miller-Kehl. In the mid-1990s, Miller-Kehl began leasing the Liberty Lot to display its vehicles for sale.

In late 1998 and early 1999, Miller-Kehl negotiated with Auffenberg Motor to sell its assets and automobile dealership to Auffenberg Motor. On June 17, 1999, Miller-Kehl entered into a personal property and equipment asset sale with Chris Auffenberg, the owner and guarantor of Auffenberg Motor.[4] A list of equipment items that formed part of the transaction included "Outside Lighting." The testimony at trial identified this as a lighted "Ford" sign that was owned by Miller-Kehl and was a part of Auffenberg Motor's asset purchase from Miller-

---

[1] Auffenberg Motor's motion to dismiss the Bedfords' cross-appeal is denied.
[2] The trial, which took place from October 2-4, 2019, was originally scheduled as a jury trial but by agreement of the parties was conducted as a bench trial.
[3] Kehl was deceased at the time of trial. His testimony was presented through deposition.
[4] In 1997, Kehl sold his ownership interest in the dealership to Miller.

Kehl. Although Auffenberg testified he believed the Lights were included in his asset purchase of the Miller-Kehl dealership, there was no evidence at trial that this reference to "Outside Lighting" meant the Lights located on the Liberty Lot, which was not owned by Miller-Kehl. Miller, for his part, testified that Miller-Kehl never owned the Liberty Lot nor the Lights and that the owners of the lot sold nothing to Auffenberg.

Also on June 17, 1999, Auffenberg Motor entered into a lease agreement (the Lease) with the then-owners[5] of the Liberty Lot, whereby Auffenberg Motor would rent the illuminated lot to display its motor vehicles for sale, as Miller-Kehl had done. The Lease required the Liberty Lot to be returned to its owners at the end of the Lease by Auffenberg Motor in the same condition in which it had taken possession, which meant that the Lights were to be affixed to the lot and in working order as they were when Auffenberg Motor took possession in June 1999.

The 1999 Lease was extended by a Second Amendment, Renewal and Extension of Lease in 2004, and again by a Third Amendment, Renewal and Extension of Lease in 2006. The Second Amendment extended the Lease for an additional two years, and the Third Amendment further extended the Lease for an additional five years to 2011 and included an option to extend the Lease for another five-year term expiring on June 30, 2016, which option was exercised.

On June 29, 2006, the Bedfords acquired the Liberty Lot from the above-referenced owners who on August 22, 2006 assigned the Lease to the Bedfords as the new lessors. The relevant Lease provisions provided as follows:

> IX: ALTERATIONS, ADDITIONS AND SIGNS
> The Tenant shall not make any alterations or additions to the leased premises
> without first obtaining the written consent of the Landlord which shall not be
> withheld unreasonably. The current signage on the leased premises is the property

---

[5] The owners of the Liberty Lot at that time were Miller and his wife, Donaldson and his wife, and Aungerer and his wife.

3

of the Tenant as a result of its purchase form the Landlord and shall remain the property of the Tenant upon termination of this Lease.

XIV: TENANT'S OBLIGATION AT THE END OF TERM
The Tenant shall at the expiration of the lease term peaceably yield up to the Landlord all the premises in such repair as the same are in at the commencement of said term or may be put in by the Landlord or its representatives during the continuance thereof, reasonable wear and use thereof and such other damage, the obligation to repair which has hereinbefore been specifically provided for in this lease, only excepted.

XVI: REMOVAL OF FIXTURES AND STOCK IN TRADE AT END OF LEASE
So far as the same are not inconsistent with the term of the lease, as hereinbefore provided, the Tenant at the expiration of this lease or within a period of fifteen (15) days thereafter shall have the right to remove all fixtures, equipment, trade or otherwise, which it has purchased or installed upon the leased premises during the term of this lease.

In early 2016, with the Lease scheduled to terminate on June 30, 2016, Auffenberg Motor's operations manager Steve Kraus contacted the Bedfords about renewing the Lease again. On January 28, 2016, the parties entered into an option contract giving Auffenberg Motor the option to renew the Lease for a new three-year term which also increased the amount of leased property and doubled the rental price. On March 31, 2016, Auffenberg Motor notified the Bedfords it was declining to exercise this option. Instead, Auffenberg Motor proposed a month-to-month tenancy under the existing terms of the Lease terminable upon thirty-days' notice. The Bedfords rejected this proposal and instead proposed to extend the lease and make it terminable upon sixty-days' notice. Auffenberg rejected the counter-proposal.

As the parties failed to reach agreement on a lease extension beyond the June 30, 2016 termination date, several relevant events occurred in June. Kraus contacted Bedford to discuss the removal of the Ford sign which Miller-Kehl had installed on the lot. Since the Lease provided that the sign was the tenant's property and could be removed upon termination of the Lease, the Bedfords did not object. In the meantime and unbeknownst to the Bedfords,

4

Auffenberg Motor was making plans to take down and remove the Lights. Kraus recruited and retained Randy Maxwell to remove the Lights, which he did, and in exchange, Kraus promised Maxwell he could keep the Lights or dispose of them as he so chose.

On June 29, 2016, the day before the Lease terminated, Larry Bedford drove by the Liberty Lot and discovered the Lights were gone. They had been unbolted from their concrete bases with the electrical wiring cut, and the breaker boxes and the electric meter had been removed as well.

Bedford contacted Kraus who told him that Auffenberg claimed the Lights as part of the June 1999 asset purchase from Miller-Kehl because they were trade fixtures that Auffenberg Motor had the right to remove upon termination of the Lease. Upon learning that Maxwell had removed the Lights and was in possession of them, Bedford repeatedly tried to reach Maxwell. Finally, on July 5, 2016, Bedford made contact with Maxwell and told him he considered the Lights' removal to be a theft done at Auffenberg's direction and that he was getting law enforcement involved in the matter. Bedford testified that he asked Maxwell to retain the Lights until the dispute was resolved. Maxwell confirmed this testimony and testified that he assured Bedford he would do so. But he did not because Kraus told him he could sell the Lights and keep the proceeds, which he did in October or November 2016 without notifying the Bedfords.

Maxwell testified the Lights were in the same condition at the time of trial that they had been when he took them down in late June 2016. Maxwell offered Bedford to reinstall the Lights for $500. He testified that when he did not hear back from Bedford on this offer, he sold the Lights in late October or November. Maxwell testified he sold a total of eight[6] light poles

[6] This number accounted for the six Lights that were directly on the Liberty Lot and two that were on the property line between the dealership and the lot and are not in dispute.

and fixtures for approximately $2,500 - $3,000, which included their delivery to the purchaser. For his part, Auffenberg admitted at trial that he did not seek to determine whether the Lights could have been stored until after resolution of the dispute with the Bedfords.

In October 2016, the Audrain County Prosecuting Attorney informed the Bedfords that no criminal charges would be filed as a result of the Lights' removal because the dispute was civil in nature. However, Kraus admitted to a Mexico, Missouri detective investigating the Lights' removal that Auffenberg had ordered their removal.

When the Bedfords learned that Maxwell had sold the Lights, they hired counsel and filed their petition for damages on February 2, 2017, for breach of the lease agreement and for conversion. On April 17, 2019, they filed an amended petition adding the tortious waste claim.

At trial, the Bedfords presented evidence of the reduction in the fair market value of the Liberty Lot caused by the removal and dissipation of the Lights. In addition to Bedford's own testimony and opinion that the property's fair market value dropped by $15,000-$16,000, the Bedfords also adduced the expert testimony of property appraiser Boyd Harris and electrician Mike Love regarding the decline in the property's fair market value resulting from the damage done to the property.

Love testified that the six Lights alone, at the time of their June 2016 removal, had a replacement value of $19,879.54 and that with electrical breaker, panel boxes, service meter, and wiring the figure was $21,983.36. After factoring in depreciation, Love opined the fair market value of the Bedfords' loss was $13,547.87.

Harris testified the fair market value of the Bedfords' property in June 2016 prior to the Lights' removal was $53,400 but dropped to $38,000 after their removal demonstrating a diminution in value to the Liberty Lot of $15,400.

6

On February 25, 2020, the trial court entered its judgment in favor of the Bedfords. The court found that Auffenberg Motor did not purchase the Lights in 1999, and that the Lights were permanent fixtures to the Liberty Lot. The trial court further found that Auffenberg Motor breached the Lease and tortiously inflicted waste on the Liberty Lot. After finding the Bedfords had a duty to mitigate their damages and failed to do so, the trial court reduced the Bedfords' $15,400 diminution-in-value damages to $2,750. The trial court's failure-to-mitigate ruling was based on the Bedfords' failure to accept Maxwell's offer to reinstall the Lights.

The trial court then trebled the $2,750 damage award pursuant to section 537.420[7] which applies to waste cases, to reach its final damages amount of $8,250.00. After the Bedfords filed motions for costs, prevailing-party attorney's fees allowable under the Lease, and post-judgment interest, the trial court entered its Judgment on June 5, 2020, adding 9% statutory post-judgment interest, $2,657.90 in costs, and $84,121.00 in prevailing-party attorney's fees. Both parties now appeal.[8]

**Standard of Review**

We will affirm a trial court's judgment in a court-tried case unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. BMJ Partners v. King's Beauty Distrib. Co., 508 S.W.3d 175, 178 (Mo. App. E.D. 2016); Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976). When a misapplication of the law is alleged, we review those claims of error *de novo*. BMJ Partners, 508 S.W.3d at 178. We review the language of a lease agreement *de novo*. Id.

---

[7] All statutory references are to RSMo 2000 as amended.
[8] Additional facts relevant to the Bedfords' points on appeal will be set forth, as needed, in the discussion section below.

7

**Point I**

In Point I, Auffenberg Motor argues that the trial court erred in finding the Lights were permanent fixtures and that their removal constituted waste because these findings were against the weight of the evidence. Specifically, Auffenberg Motor contends that because the Lights were "easily removed," they were not permanent fixtures and that because their removal did not permanently injure the Bedfords' property, no cause of action for waste arose. We disagree.

"The test for determining whether property has become a fixture is three-fold, consisting of: 1) the annexation to the realty; 2) the adaptation to the use to which the realty is devoted; and 3) the intent that the object become a permanent accession to the land." Freeman v. Bars, 237 S.W.3d 285, 288-89 (Mo. App. S.D. 2007). "Whether or not an article is a fixture depends upon the facts and circumstances of a particular case." Id. "The annexation element refers to the physical attachment of the property to the realty...." Herron v. Bernard, 390 S.W.3d 901, 911-12 (Mo. App. W.D. 2013). "Annexation that may be slight and easily displaced does not prevent an article from becoming a fixture when the other elements are found." Freeman, 237 S.W.3d at 289. "The adaptation element refers to the characteristics of fitness or suitability for the building or premises in question." Hoffman Mgmt. Corp. v. S.L.C. of N. Am., Inc., 800 S.W.2d 755, 760 (Mo. App. W.D. 1990). This element is met if the chattel at issue is "peculiarly adapted to the real property." Id.

The intent element refers to whether the "intention in annexing the article to the realty was to make it a permanent accession to the land." Herron, 390 S.W.3d at 912. "[I]ntention is to be determined as of the time the articles were annexed[,] and it is the [i]ntent of the annexor at the time of annexation [that] controls as to whether something is to be considered a fixture." Id.

8

The burden is on the party asserting the existence of a fixture to prove the elements, and "[e]ach of the elements . . . must be present to some degree, however slight." Id. at 909.

Here, the evidence at trial, presented through exhibits and witness testimony, was overwhelming that the Lights were fixtures. Moreover, since Auffenberg Motor did not own the Lights and had no colorable legal right under the Lease to remove and dispose of them, it actually matters little whether they were fixtures or not. The trial court found, and we agree, that the original owners of the Liberty Lot purchased and installed the Lights during the mid-1990s in order to be able to rent the illuminated lot to the adjacent dealership for the display of its automobiles for sale. Prior owners Miller and Donaldson testified at trial that the intent of the Liberty Lot ownership group was that such lighting equipment would be a permanent part of that real property, specifically to be used as an illuminated car lot to be leased to an automobile dealership. This improvement to the real estate remained in place and was used for the same intended purpose for more than twenty years, until Auffenberg Motor unbolted them, cut the wires, and ripped them off the Liberty Lot. Thus, the trial court's finding that the Lights were fixtures permanently made a part of the Liberty Lot is supported by substantial evidence and is not against the weight of the evidence.

Auffenberg Motor argues that because the Lights could be unbolted and their wires cut, they were not permanent fixtures. This argument is unavailing. The ease of removal is not the test for determining whether something is a permanent fixture or not. See State ex rel. Missouri Highway and Transp. Com'n. v. Jim Lynch Toyota, Inc., et al., 835 S.W.2d 421, 426 (Mo. App. E.D. 1992) (Evidence supported finding that utility sink, restaurant booth seats, booth tables, patio tables, roof light beams, and planter boxes which were integrally affixed to building were "building fixtures" for purposes of allocation of condemnation award between lessor and

9

commercial lessee under lease); see also Francis v. Richardson, 978 S.W.2d 70, 74-75 (Mo. App. S.D. 1998) (Evidence supported determination that structure attached to rear of commercial building was not a trade fixture, but was improvement that tenants were barred from removing under lease agreement, even though tenants testified that structure was temporary and merely housed equipment).

Therefore, the overwhelming evidence supports the judgment and established that the original owners of the Liberty Lot installed the Lights with the intention that they be permanent fixtures which changed and enhanced the nature and utility of the lot as a suitable site to rent for the display of automobiles for sale. The evidence further established that Auffenberg Motor unjustifiably removed and dissipated the Lights in breach of the Lease and that such actions constituted tortious waste upon the Bedfords' property. Point I is denied.

**Point II**

In Point II, Auffenberg Motor argues the trial court erred and misapplied the law in finding the measure of damages to be the diminution of value of the Bedfords' property immediately before and after the waste occurred. Specifically, Auffenberg Motor argues the trial court should have applied as the measure of damages the cost-of-repairs necessary to restore the lot to its condition at the time the Lights were removed. We disagree.

When a lessor claims damages for a lessee's breach of the covenant to repair or to return its premises in a particular condition, the general rule is that once the lessor satisfies its burden of proof by presenting evidence of one measure of damages, the burden shifts to the lessee to establish that another measure of damages is more appropriate. McLane v. Walmart Stores, Inc., 10 S.W.3d 602, 606 (Mo. App. E.D. 2000). While the standard used in waste and tortious-injury-to-property cases is similar to the one used in breach-of-lease cases, the standard is

10

usually applied differently in that "cost of repairs" is favored in breach-of-lease cases and "diminution of value" is favored in cases involving waste or the tortious damage to property. Id.

> "Generally, compensation for tort damages attempts to restore the injured party to the position he would be in if the [tort] had not been committed. In the case of a breach of contract, the goal of compensation is not the mere restoration to a former position, as in tort, but the awarding of a sum which is the equivalent of performance of the bargain—the attempt to place the [injured party] in the position he would be in if the contract had been fulfilled." McCormick, Damages, Section 137, p. 561 (1935).

Hensic v. Afshari Enterprises, Inc., 599 S.W.2d 522, 524 n. 4 (Mo. App. E.D. 1980). Having laid out these general rules, the particular facts of each case determine which measure of damages is to be used. Lipton Realty, Inc. v. St. Louis Housing Authority, 705 S.W.2d 565, 569 (Mo. App. E.D. 1986).

Here, the trial court determined the measure of damages to be the diminution in the fair market value of the Bedfords' real property before and immediately after the Lights were removed from their property. We find this to be proper in this case. While Auffenberg Motor asserted at trial, and now here, that the trial court erred by failing to apply the cost-of-repair measure of damages, its own expert, a real estate appraiser, opined that the diminution in value is the appropriate measure of damage in this case. And the Bedfords' real estate appraiser concurred that diminution in the fair market value was the proper measure of damages.

Thus, it was no surprise that the trial court applied the diminution-in-value measure of damages. The trial court found that because the Lights' removal and dissipation resulted in permanent damage to the Bedford's real estate such that the cost-of-repair method was inapplicable, the trial court determined the property lost $15,400 in value which was the amount in evidence representing the cost to install new lights and fixtures on the lot. We find no error in

11

the measure of damages employed by the trial court and no error with respect to the amount the court found the property lost in value. Point II is denied.

## Point III

In Point III, Auffenberg Motor attacks the attorney's fees award. It argues the trial court erred in finding that "the parties acknowledged and stipulated before trial" that prevailing-party attorney's fees were to be awarded "to the prevailing party herein" because it asserts the record does not support such a finding. Further, Auffenberg Motor argues that the Lease allowed only "reasonable" attorney's fees and that the $84,121.00 awarded is not "reasonable" relative to the $2,750.00 awarded as damages. We disagree on both counts.

The trial court's award of attorney's fees is reviewed for an abuse of discretion. Berry v. Volkswagen Grp. Of Am., Inc., 397 S.W.3d 425, 431 (Mo. banc 2013). The trial court is an expert in attorney's fees and may fashion such an award in its discretion. Id. To demonstrate an abuse of discretion, the complaining party must show the trial court's decision was against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice. Id. In Missouri, the general rule is that attorney's fees are not awarded to every successful litigant; however, attorney's fees may be awarded when they are provided for in a contract or when they are authorized statutorily. Id.

In this case, the Lease sanctioned the award of attorney's fees to the prevailing party in any litigation arising from the Lease. The parties confirmed as much prior to trial by stipulating that the Lease authorized the court to award prevailing-party attorney's fees. So, the only remaining question for our consideration is whether the trial court abused its considerable discretion in connection with the amount of attorney's fees awarded.

12

In the exercise of its discretion to award reasonable attorney's fees, there are certain factors that the trial court may consider to determine the amount of the award. Gilliland v. Missouri Athletic Club, 273 S.W.3d 516, 523 (Mo. banc 2009). While one such consideration is the result achieved at trial, O'Brien v. B.L.C. Ins. Co., 768 S.W.2d 64, 71 (Mo. banc 1989), there are others including:

> 1) the rates customarily charged by the attorneys involved in the case and by other attorneys in the community for similar services; 2) the number of hours reasonably expended on the litigation; 3) the nature and character of the services rendered; 4) the degree of professional ability required; 5) the nature and importance of the subject matter; 6) the amount involved or the result obtained; and 7) the vigor of the opposition.

Berry, 397 S.W.3d at 431. Furthermore, while an award of attorney's fees should have some relationship to the award, "there is no established principle that the fee may not exceed the damages awarded." Id.; O'Brien, 768 S.W.2d at 71. Missouri courts have upheld reasonable attorney's fees in lengthy and vigorously litigated cases to prevailing parties, and absent a contrary showing, "the trial court is presumed to know 'the character of the services rendered in duration, zeal, and ability.'" Nelson v. Hotchkiss, 601 S.W.2d 14, 21 (Mo. banc 1980) (quoting Munday v. Thielecke, 290 S.W.2d 88, 90-92 (Mo. 1956) (upholding an award of substantial attorney's fees because the underlying defendants in a partition action were the "principal cause of making the work in [the] case very difficult and of making the case vexatious for the court and for the attorneys for plaintiff.")

Given Missouri caselaw on this matter, we are unpersuaded by Auffenberg Motor's argument that the lopsided relationship between the damages award and the attorney's fees award demonstrates an abuse of discretion. First of all, Auffenberg Motor repeatedly and incorrectly states the amount of damage to the property was only $2,750.00 when the evidence demonstrated it was $15,400.00.

13

Moreover, the record shows the trial court carefully considered the attorney's fees issue which was well-briefed. The court was well aware of the nearly three-and-a-half-years' of litigation and of Auffenberg Motor's role in not only precipitating this dispute, but also in intensifying the litigation which made it more costly to the Bedfords. Auffenberg Motor was first to endorse a real estate appraiser as an expert witness which injected into the case the diminution-in-fair-market-value issue and compelled the Bedfords to retain and endorse their own appraisal expert which significantly increased the Bedfords' attorney's fees.

Therefore, the trial court's decision with respect to the attorney's fees award is on solid footing. The parties' pre-trial stipulation merely confirmed the Lease's provision authorizing the award of prevailing-party attorney's fees. And the record fully supports the amount of the award, $84,121.00, as reasonable following more than three years of vigorously-contested litigation. Point III is denied.

### Cross-Appeal

In their cross-appeal, the Bedfords argue the trial court erred in finding that they had a duty to mitigate their damages and failed to do so in connection with both the tortious waste and breach of lease theories of recovery. We agree because we find that the Bedfords did not have a duty to mitigate as a matter of law in that the damage done to their property was the result of tortious conduct on the part of Auffenberg Motor.

In Missouri, mitigation of damages as a generally recognized principle of law is also known as the rule of avoidable consequences. Braun v. Lorenz, 585 W.W.2d 102, 108 (Mo. App. W.D. 1979). The rule requires that one damaged through the breach by another of some legal duty or obligation must make reasonable efforts to minimize the resulting damage. Id. The burden of proof is on the defendant to show the injured party had the opportunity to mitigate its

14

damages. Id.; Shady Valley Park & Pool, Inc. v. Fred Webber, Inc., 913 S.W.2d 28, 35 (Mo. App. E.D. 1995). The defendant must also show the reasonable, prospective consequences of mitigation. Smith v. City of Miner, 761 S.W.2d 259 (Mo. App. E.D. 1988). In the absence of evidence of mitigating circumstances, the issue of mitigation fails. Id. at 260.

However, Missouri courts have consistently held that mitigation is inapplicable in the context of intentional and tortious conduct. Fletcher v. City of Independence, 708 S.W.2d 158, 172 (Mo. App. W.D. 1986); Paddock v. Somes, 102 Mo. 226, 14 SW.746 (1890); Grant v. St. Louis I.M. and S.Ry. Co., 149 Mo. App. 306, 130 S.W.80, 82 (1910). See also 22 Am. Jur. 2d Damages § 359 (2021); Restatement (2nd) of Torts, § 918 (2) (1979). "The law so roundly condemns such conduct as to refuse to allow such a tortfeasor to assert the simple neglect of the victim to allay the damages so flagrantly incurred." Fletcher, 708 S.W.2d at 172. "In some states, the rule of avoidable consequences does not apply in cases of intentional or positive and continuous torts involving property. In those instances, the injured party may recover damages sustained even though, by the exercise of ordinary care and diligence, he or she could have avoided those damages." Am. Jur. 2d Damages § 393 (2021).

Thus, we are unpersuaded that the mitigation rule has any role in this case in light of Auffenberg Motor's intentional breach of the Lease and tortious waste committed against the Bedfords' property.

And even if we were to find that the Bedfords had a duty to mitigate, we are unpersuaded that Auffenberg Motor proved on this record that the Bedfords could have, but did not, mitigate their damages. We find that an offer, by the party committing the waste, to return the tortiously-removed property - in this case, Maxwell's offer to reinstall the Lights for a price - does not constitute a reasonable opportunity to mitigate. A waste victim should not be penalized for

15

failing to accede to what is effectively a demand for ransom for the return of tortiously-removed property, especially when the tortfeasor has assured the victim that the property will be retained until the dispute is over.

Auffenberg Motor's tortious conduct reached its conclusion here when its agent Maxwell sold the Lights and kept the proceeds despite his assurance not to do so until this dispute was resolved. Maxwell admitted that when he broke his promise to the Bedfords to retain the Lights, he did so at Auffenberg Motor's direction, and that he provided the Bedfords no notice or warning. Therefore, Auffenberg Motor failed to show through substantial evidence that the Bedfords had a reasonable opportunity to mitigate and failed to do so. See Sterbenz v. Kansas City Power & Light Co., 333 S.W.3d 1, 15-16 (Mo. App. W.D. 2010) (Landowners who brought permanent trespass action against electric utility regarding lack of easement for electric line did not have a duty to mitigate damages by permitting removal of line in light of stipulation that line would stay at location where installed and that, in exchange for trespass damages, landowners would deliver a written easement to utility). Therefore, the issue of mitigation of damages fails as a matter of law and the trial court erred in reducing the Bedfords' $15,400 in actual damages to $2,750. The cross-appeal is sustained.

**Conclusion**

For the reasons stated above, the trial court did not err in finding that Auffenberg Motor's actions in removing and dissipating the Lights constituted a breach of the parties' lease agreement and constituted waste against the Bedfords' real property. Likewise, the trial court did not err in awarding the Bedfords $84,121.00 in prevailing party attorney's fees. The trial court erred, however, in finding that the Bedfords had a legal duty to mitigate damages and failed to abide by that duty following Auffenberg Motor's tortious removal and waste of the Lights.

16

Therefore, under our authority set forth in Supreme Court Rule 84.14, we amend the trial court's judgment by vacating the mitigation portion of the judgment and instead we affirm the trial court's finding that the Bedfords' actual damages are $15,400.00 and by operation of section 537.420, those damages are trebled for a total damages judgment of $46,200.00. Accordingly, the Judgment is affirmed as amended.

James M. Dowd, Judge

Angela T. Quigless, P.J., and
Kurt S. Odenwald, J., concur.

17